[Cite as *Allan v. Allan*, 2019-Ohio-2111.]

# COURT OF APPEALS OF OHIO

# EIGHTH APPELLATE DISTRICT
# COUNTY OF CUYAHOGA

TAREQ AHMED ALLAN,                    :

    Plaintiff-Appellant,          :

                                          No. 107142

    v.                            :

RAIDA A. ALLAN,                       :

    Defendant-Appellee.           :

---

## JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** May 30, 2019

---

Civil Appeal from the Cuyahoga County Court of Common Pleas
Domestic Relations Division
Case No. DR-15-355865

---

### *Appearances:*

John V. Heutsche Co., L.P.A., and John V. Heutsche; and
Reminger Co., L.P.A., Holly M. Wilson, Brian D. Sullivan,
and Katie Lynn Zorc, *for appellant.*

Raslan & Pla, L.L.C., and Lila D. Raslan, Jorge Luis Pla,
and Nadia Zaiem; Dinn, Hochman & Potter, L.L.C., and
Edgar H. Boles, *for appellee.*

MARY J. BOYLE, J.:

{¶ 1} Plaintiff-appellant, T.A. ("husband"), appeals from the final divorce decree entered by the Cuyahoga County Common Pleas Court, Domestic Relations Division, terminating his marriage to defendant-appellee, R.A. ("wife"). Husband raises two assignments of error for our review:

> 1. The trial court erred in awarding patently unreasonable legal fees in the amount of $300,000 to wife.

> 2. The trial court erred in concluding that businesses sold years prior to the initiation of these divorce proceedings in 2015 constitute marital property.

{¶ 2} Finding no merit to his arguments, we affirm.

## I. Procedural History and Facts

{¶ 3} Husband filed for divorce in February 2015. Wife answered husband's complaint and filed counterclaims against husband and cross-claims against husband's brother, Q.A. ("Q.A.") whom she joined as a third-party defendant. Wife also joined businesses, Pearl Road, Inc. and 871 Rocky River Drive, Inc., as third-party defendants. Q.A., Pearl Road, Inc., and 871 Rocky River Drive, Inc. filed counterclaims and cross-claims against both husband and wife as well.

{¶ 4} On June 30, 2015, Q.A. filed a lawsuit in the Cuyahoga County Court of Common Pleas against husband and Tallan, L.L.C., for $188,085. *See* Cuyahoga C.P. No. CV-15-847754. The common pleas court dismissed Q.A.'s complaint without prejudice in May 2018.

**{¶ 5}** Before the parties' divorce trial began, the trial court issued a judgment dismissing wife's cross-claims against Q.A.'s wife's counterclaims against husband that involved tort and contract claims, wife's claims against the two businesses, and Q.A.'s claims against wife and husband. The trial court made clear, however, that Q.A. and the businesses remained properly joined parties "but only as stakeholders of property."

**{¶ 6}** After a 14-day trial that took place in July, September, and November 2017, the trial court issued a 38-page judgment entry in April 2018. The following facts were presented at trial.

### A. Previous Marriages

**{¶ 7}** Wife became a naturalized citizen of the United States in 1986. She married her first husband, and they had three children together. Wife's first husband died in 1993. Wife received life insurance money for his death, which she immediately invested.[1] Wife also inherited a grocery store from her first husband. Additionally, wife became the sole owner of a home on Devon Drive in North Olmsted that she had owned with her first husband.

**{¶ 8}** Wife married a second time, but this marriage was annulled.

---

[1] The trial court found that wife's investment accounts originating from her first husband's life insurance money was separate property. The trial court noted that wife "was cross-examined at length about the rollovers and transfer of funds." The trial court found that "[t]he tracing of the rollovers and transfers were obvious and the records provided. There is no reason other than obfuscation or harassment that the separate nature of these funds could not have been stipulated prior to trial." Husband does not challenge this finding and, thus, wife's investment accounts are not at issue on appeal.

{¶ 9} Husband came to United States in 1989. He married his first wife, who was a United States citizen, in 1992. Husband and his first wife had one child in 1995.

{¶ 10} Husband and his first wife filed for dissolution in May 1999, but later dismissed the petition. Wife (R.A.) contends that husband paid his first wife to dismiss the dissolution until he became a United States citizen. Husband denies wife's contention and claims that he did not want his first marriage to end. Husband agreed, however, that if his first wife would have gone through with the dissolution, he would not have obtained his citizenship. Husband became a United States citizen in October 2000. Husband and his first wife obtained a dissolution in February 2001.

## B. Husband's and Wife's Early Years

{¶ 11} Although husband was still married to his first wife, husband and wife (R.A.) began dating sometime in the mid-1990s. Wife testified that she and husband were religiously wed in a mosque in July 1996. Wife explained that in the Arab culture, religious ceremonies were more important than civil ceremonies. Wife testified that husband moved into her house on Devon Drive, North Olmsted after they were religiously wed. Although husband disputed this fact at trial, the trial court found that there was "much evidence" presented that husband moved in with wife and had lived with her "since the 1990s."

{¶ 12} Husband assisted wife in selling her grocery store. Wife took that money and, with two business partners, purchased a gas station business with a

convenience store located on Pearl Road in November 1996, for a purchase price of approximately $75,000. Wife and her partners, however, did not purchase the land on which the gas station sat. Wife contributed $56,500 to the purchase of the Pearl Road gas station, which was money that she had received from selling her grocery store. Wife eventually became the sole owner of the Pearl Road gas station after she bought out her business partner for $57,500.[2] Husband began working at the Pearl Road gas station sometime in 1997. Husband and wife had their first child in April 1998.

{¶ 13} In March 2001, husband purchased 51 shares of wife's Pearl Road gas station. Wife claims that husband coerced her into selling him part of the gas station because he was embarrassed that he did not have any money and could not sponsor his brother, Q.A., to come to the United States. According to a March 1, 2001 stock purchase agreement, husband purchased 51 shares of the Pearl Road gas station for $510. Husband claims that he actually purchased the 51 shares for $80,510 because his father wired $80,000 to wife for the purchase. Husband agreed, however, that the stock purchase agreement only stated $510. According to a May 10, 2002 stock purchase agreement, husband purchased wife's remaining 49 shares of the Pearl Road gas station for $980. Wife claims that she never received $510 or $980 for the shares, let alone $80,000. Husband did not present any evidence showing that he paid these amounts to wife.

---

[2] Wife testified that she originally had two business partners with the Pearl Road gas station. But the evidence is not clear as to what happened to the third business partner.

{¶ 14} Husband and wife were legally married in October 2002. In August 2003, wife deeded her residence to herself and husband as joint and survivor owners. At the time of the deed, the value of the North Olmsted home was $159,500 and the home was debt free. The parties agree that the home is marital property. They further stipulated that at the time of the divorce, the value of the marital home was $155,000.

{¶ 15} Husband and wife's second child was born in December 2003 and, thus, was still a minor at the time of the divorce.

### C. Husband Purchases Rocky River Drive Gas Station

{¶ 16} In October 2004, husband purchased a gas station at 871 Rocky River Drive for $385,000. The sale included the property, all equipment, and the building. Husband said that he purchased the gas station on Rocky River Drive in part based on a ten-year loan from Charter One Bank for $269,500. Husband stated that he also put $120,000 down on the Rocky River Drive gas station from money that he had "saved" from the Pearl Road gas station.

{¶ 17} Husband incorporated the Rocky River Drive gas station business under the name 871 Rocky River Drive, Inc. The real estate, including the land and building of the Rocky River Drive gas station, was titled to husband's company Tallan, L.L.C. that he incorporated on June 18, 2004.

### D. Renovations to the Rocky River Drive Gas Station

{¶ 18} Husband testified that he decided to renovate the Rocky River Drive gas station sometime in 2007. According to husband, wife did not want him to

renovate the gas station, and did not want anything to do with the renovations. Husband hired an architect to draw up the plans and Skliros Construction to renovate the entire gas station for $635,000. Construction began around June 2009.

{¶ 19} Husband testified that he chose Skliros to perform the renovations because Skliros agreed to finance the project and did not require a down payment or any money up front. Husband also stated that he did not pay Skliros at any time during the construction. Husband testified that their arrangement was that once the gas station reopened, he would make payments to Skliros.

{¶ 20} Despite husband's testimony regarding payment to Skliros, on October 5, 2009, husband and wife took out a ten-year mortgage of $120,000 on the marital home from U.S. Bank for the renovations of the Rocky River Drive gas station. Husband and wife both signed the document as "borrower" and initialed each page. On the third page, the document states that "By signing this mortgage, [wife] agrees to subordinate her interest to U.S. Bank, N.A." Husband testified that he used this money for the canopy and the refurbished pumps of the gas station.

{¶ 21} Further, wife testified that she and husband paid Skliros $50,000 in cash to start the renovation. Tom Skliros, the owner of Skliros Construction, testified that he could not recall if he received a cash deposit of $50,000.

{¶ 22} Wife testified that she also took $50,000 from her annuity on January 6, 2010, for the renovation project. Wife submitted documents showing that she removed this money from her annuity. Husband denies this occurred even

though Tallan, L.L.C.'s bank records show that $50,000 was deposited on January 12, 2010.

{¶ 23} Husband testified that the Rocky River Drive gas station was closed for most of 2010, because he had run out of money. Husband agreed, however, that the gas station had purchased 1,088,555 gallons of gasoline for retail sale in 2010. In 2011, the gas station purchased 1,358,104 gallons.

{¶ 24} Husband testified that the renovations were completed by October 10, 2010, which is when husband stated that the gas station reopened. Husband agreed that the gas station convenience store was open throughout the construction.

**E. Wife Files for Divorce in September 2010**

{¶ 25} Husband and wife separated in June 2010, after an incident where the police were called. Husband moved out of the parties' marital home at that time pursuant to a domestic violence petition filed by wife (that she later dismissed). Wife filed for divorce in September 2010. Wife dismissed this divorce proceeding on April 14, 2011, after the parties filed a joint reconciliation with the court. Wife testified that she did so because husband told her, among other things, that he would go to marriage counseling. Wife testified that husband walked out of their first session, halfway through the session, and never returned. Husband never moved back into the parties' North Olmsted home.

## F. Sale of Rocky River Drive Gas Station

{¶ 26} Husband explained that he had to sell the Rocky River Drive gas station to his brother (Q.A.) because he had run out of money and Skliros had placed a mechanic's lien on the property. Husband testified that he sold the Rocky River Drive gas station business to his brother in part for $310,000, but he did not sell the real estate to Q.A. (which Tallan, L.L.C., husband's company, still owned). Although husband's testimony was somewhat contradictory, husband said that he sold the Rocky River Drive gas station to Q.A. in two transactions. Husband stated that sometime between November 2010 and March 2011 (this is our summary of the many dates that he gave during trial), Q.A. purchased 49 percent ownership of the gas station for improvements that Q.A. had made to the store that husband could not afford to complete himself because he had run out of money. Husband testified that his brother bought it "right after we opened [in October 2010], and when we did that promissory note with Skliros." The $300,000 Skliros promissory note (which we will discuss below) was dated March 7, 2011.

{¶ 27} Husband further testified that he sold the remaining 51 shares of stock to his brother on September 14, 2012, for $175,000. Husband explained that he transferred it in two parts so that his brother would not lose the liquor license. Husband further stated that his brother paid him $10,000 for good faith.

## G. Q.A.

{¶ 28} Q.A. came to the United States in August 2001. He stated that before he came, he wired $60,000 to wife, but that wife never paid him the money back.

Q.A. testified that in 2004, wife told him that she would not give the money to him and that he should get the "f#ck out of her house."

{¶ 29} Q.A. first worked at the Pearl Road gas station and then in 2004, he also worked at the Rocky River Drive gas station. Q.A. stated that when husband ran out of money to complete the renovations, he asked Q.A. for help. Q.A. and his wife both testified that they sold Q.A.'s wife's jewelry for about $84,000 so that Q.A. could finish the renovations of the Rocky River Drive gas station. Q.A. stated that he and his wife finished the inside of the building of the Rocky River Drive gas station with their own funds, including coolers, counters, walls, floors, and security cameras, as well as the driveway and landscaping. Neither Q.A. nor Q.A.'s wife could produce any evidence that they paid for these items out of their personal funds.

**H. Tom Skliros**

{¶ 30} Skliros testified that he originally gave husband a price of $635,000 to renovate the entire Rocky River Drive gas station, including the canopy, pumps, tanks in the ground, and the convenience store. Skliros, however, did not complete all of the work on the gas station.

{¶ 31} Skliros filed a mechanic's lien against the property for $635,000 in July 2010. He stated that he filed the lien to protect himself because he heard that husband was having economic and personal problems.[3] Skliros's July 2010 lien states that he began working on the property on June 8, 2009 and completed it on

---

[3] Skliros filed the first mechanic's lien approximately two weeks after wife filed a domestic violence petition against husband in June 2010.

July 13, 2010. Skliros filed a satisfaction of mechanic's lien on October 5, 2010, because he stated that he did not end up renovating the entire gas station. Skliros explained that he just renovated the outside structure of the building. Skliros admitted that the mechanic's lien was not valid because it represented an estimate of the work, not the actual work. Skliros also did not demand payment from husband before filing the lien. Skliros further admitted that when he filed this lien, he was not done with the work.

{¶ 32} On October 5, 2010, Skliros filed a second mechanic's lien against the property for $330,580. In it, he explained that he started the work on June 8, 2009, and completed it on September 25, 2010. Skliros stated that he could not recall if he demanded payment from husband. Further, there was no notice of furnishing labor and materials filed. On February 7, 2011, Skliros filed a release of this mechanic's lien, stating that the $330,580 debt had been "satisfied, released and discharged."

{¶ 33} Skliros filed a third mechanic's lien against the property in February 2011, for $330,580. In it, he stated that he began the work on June 8, 2009, and completed it in November 2010. Skliros did not remember why he filed the third mechanic's lien, but thought it was "probably" because he had completed more work on the project after he filed the other mechanic's liens.

{¶ 34} Husband testified that he talked Skliros into accepting $300,000, which is why Skliros came back to him with the $300,000 promissory note. Husband signed a promissory note in favor of Skliros on March 7, 2011 and secured

it with a mortgage on the real estate where the Rocky River Drive gas station was located, which Tallan, L.L.C. owned.

{¶ 35} When Skliros was shown the $300,000 promissory note at trial, he said that he was "confused." Skliros testified that he did not know anything about the $300,000 note. Skliros testified that he had never seen the document.

{¶ 36} Upon further questioning from husband's counsel, Skliros said that he remembered from his deposition that husband was not going to pay him up front and that he agreed to finance the project.

{¶ 37} Skliros further agreed that he signed an "Assignment and Assumption Agreement" on October 1, 2012, with husband as the sole member of Tallan, L.L.C., and Q.A. as president of 871 Rocky River Drive, Inc. This agreement states that husband assigned the remaining amount of the $300,000 promissory note that he owed to Skliros ($174,621) to 871 Rocky River Drive, Inc., and that 871 Rocky River Drive, Inc. agreed to assume the debt. Skliros testified that although he did sign the assignment and assumption agreement, he did not know what the document was. Skliros agreed that in his deposition, he testified that he did not remember ever seeing the substitute promissory note.

{¶ 38} Skliros testified on cross-examination that he entered into a written contract with husband for the renovation project, but stated that he could not find the contract. When Skliros started the project, he did not know if husband or Q.A. owned the business. He said that he thought it was "a family thing."

{¶ 39} Skliros agreed that he was paid monthly during the project on checks made from the bank account of "871 Rocky River Drive Inc, Grocery." Skliros stated that the construction contract was for $360,580. He received a total amount of $263,000 from the checks.

### I. Sale of Pearl Road Gas Station

{¶ 40} Husband purchased the leasehold from Sunoco in March 2009 for the Pearl Road gas station for $250,000. Husband testified that he decided to sell the Pearl Road gas station to his brother on November 22, 2013, for $150,000 because he could not negotiate a new lease with Tober, Inc. Tober, Inc. owned the land on which the gas station sat. Husband stated that he "negotiated so many times, and [they] had emails back and forth between" their lawyers "nonstop to come to arrangement." Husband claimed that without a valid lease, no one would purchase the property, and that is why he believed $150,000 was a fair price even though it was $100,000 lower than what he had paid for the leasehold from Sunoco just four years previously.

{¶ 41} Husband agreed that during his deposition, he stated that Kurt Tober wanted to increase his monthly rent to somewhere between $6,500 and $8,300. But husband agreed that the actual agreement proposed was $4,000 per month for the first five years, $4,500 for the next 5 years, and $5,000 for the third five years. Husband also agreed that Pearl Road, Inc. continued to pay $2,464 per month to Tober.

{¶ 42} Husband testified that for the Pearl Road gas station, Q.A. paid him $100,000 by check as a down payment for the Pearl Road gas station and then signed a promissory note in the amount of $50,000. Husband agreed that the November 22, 2013 agreement between he and Q.A. did not have a purchase price in it because it was contingent upon his brother negotiating a new lease with Tober. Husband stated, "No agreement, no sale." Husband later testified that was not true. Husband explained that he sold the Pearl Road gas station to his brother "as is" and that his brother was "on his own" to negotiate a new lease with Tober. Husband stated that is why he and Q.A. entered into a second purchase agreement on September 12, 2014. The second agreement between husband and Q.A. had the purchase price of $150,000 in it, but it did not acknowledge that brother had already made a $100,000 payment. Husband's and Q.A.'s testimony was not straightforward regarding the sale of the Pearl Road gas station.

**J. Kurt Tober's Testimony**

{¶ 43} Tober, the president of Tober, Inc., testified that his company owns the land on which the Pearl Road gas station sits. Tober stated that when Sunoco notified him that they assigned their leasehold to husband, Tober's attorney sent a new lease agreement to husband in September 2009. Tober stated that he did so at his attorney's suggestion. Tober testified that when husband rejected that proposal, Tober immediately agreed to continue the monthly rent at the same terms as the lease they had been operating under with Sunoco, which was $2,464 per month until May 20, 2015.

{¶ 44} Tober testified that when he spoke to husband after he learned that husband had rejected the higher rent, Tober told him on the phone, "That's fine[.] * * * Throw the lease away. Let's just continue the present lease[.]" Tober testified that he did not agree with his attorney to increase the rent in the first place. Tober said that he does not "like to have squabble in [his] life. And it wasn't all that important to be, to be very honest. So whatever money that was being sent to [him] was satisfactory[.]"

{¶ 45} Tober denied that he ever threatened to cancel husband's lease. Tober denied that he and husband ever had a "battle" over the lease. Tober further denied that he ever proposed a monthly rent of $6,500 to $8,300 per month as husband had testified to in his deposition. Tober agreed that it was "totally false" that husband had a chance of losing the lease. Finally, Tober said that there were never any emails back and forth between him and husband regarding a new lease, let alone over the course of two years.

{¶ 46} Tober testified that husband contacted him in 2013 and said that he was selling the Pearl Road gas station to his brother. Husband told Tober that he would send him the amendment to the lease, and if he agreed, Tober should sign it and send it back, which Tober said that he did. In the 2013 amendment, Q.A. proposed beginning the new lease on May 1, 2014, for an initial term of five years at $2,464 per month; for $2,540 during the first five-year extended term; and $2,618 for the second five-year extended term. Tober said the terms of the 2013

amendment were fine with him. But Tober denied that he ever negotiated any terms with Q.A. Tober said that he simply received the new lease and signed it.

### K. Charter One Note

{¶ 47} The Charter One note for $269,500 that husband had taken out in 2004 to purchase the Rocky River Drive gas station became due in the fall of 2014. Charter One Bank sent a letter to Tallan, L.L.C. in May 2014, stating that the loan balance of $180,140.11 was due in full by October 25, 2014. Husband claimed he did not know that this note was going to be due in the fall of 2014, despite the original loan documents stating so as well as each monthly statement. Husband testified that he went to Charter One Bank and Key Bank and neither would loan him the money or permit him to refinance the loan. The original loan was guaranteed personally by husband as well as 871 Rocky River Drive (the real estate) and Pearl Road, Inc.

{¶ 48} Husband testified that he borrowed $188,088 from Q.A. in November 2014 to pay the Charter One loan. Q.A. corroborated husband's testimony, stating that he paid the remaining balance of the Charter One loan, and husband signed a promissory note to pay the money back to him. Husband agreed that he secured the promissory note to Q.A. with two "mortgages on real estate" — the land on which the Rocky River Drive gas station sat (owned by Tallan, L.L.C., which was owned by husband) and the marital home. Husband executed the two mortgages on February 4, 2015, just before he filed his complaint for divorce on February 18, 2015. According to the promissory note, husband was supposed to pay

his brother $4,500 per month beginning on December 1, 2014.  Husband agreed that he never made any payments to his brother.

**L. Trial Court's Judgment Entry**

**{¶ 49}** The trial court aptly stated that the issue that involved most of the court's time in trial were the questions: (1) what was marital property, (2) what was separate property, and (3) whether Q.A. "purchased the two gas stations at fair market value or at all."

**{¶ 50}** The trial court concluded that the duration of the marriage was from February 9, 2001 (when husband's marriage to his first wife dissolved) until the first day of trial, June 10, 2016.  The court found that it was not equitable to use the parties' legal marriage date as the commencement of the marriage due to the parties' "financial relationship and entanglement."

**{¶ 51}**  Regarding the marital home, the trial court stated:

> Neither party argued that the residence on Devon Drive was not joint property.  Although owned by [wife] and mortgage free prior to [husband] and [wife's] civil marriage, [wife] transferred that residence into joint names.  [Wife] also agreed to mortgage it to renovate [the Rocky River Drive gas station] in October 2009.  [Wife] did argue that the court could trace her premarital portion of $159,000 so that given the current value of $155,000, there would be no marital value remaining.  Given the overall equities in this matter and in consideration of the duration of marriage finding, the court declines to use a tracing method to exclude [husband's] interest in this property [that] the parties used, in part, to finance the renovation of [the Rocky River Drive gas station].  However, the court does hold that the subsequent mortgage signed by [husband] in favor of [Q.A.] signed immediately prior to the filing of this action and without the signature, knowledge, or consent of [wife], is financial misconduct by [husband].

**{¶ 52}** With respect to the Pearl Road gas station, the trial court found that husband did not prove that this property was separate property.[4] The court explained that wife "solely owned the asset" until March 1, 2001, which was after the parties' de facto marriage date. The court noted that since wife's transfers of the Pearl Road gas station stock to husband occurred "during the marriage," the Pearl Road gas station was not separate property. The court disagreed, however, with wife that the Pearl Road gas station was her separate property.

**{¶ 53}** The trial court found that Tallan, L.L.C. owned the real property at the Rocky River Drive gas station. Based on expert testimony, the court found that the real property was marital property worth $520,800, which was what Cuyahoga County ("the most neutral value," according to the trial court) valued the land for tax purposes in 2014. The court further found that the $188,080 promissory note signed by husband "immediately before the filing" of the divorce in favor of Q.A. and secured by a mortgage in part on the Rocky River Drive real estate was "part of the financial misconduct" by husband and was "questionable" debt that "should not be included in any division of property."

**{¶ 54}** Regarding the two gas station businesses, the trial court stated that it had "no faith" in husband's testimony. The court explained that "[t]he inconsistencies, illogic and self-serving nature of [husband's] testimony requires the

---

[4] The trial court did not order any party to transfer the title of either gas station.

questioning of the alleged validity of the documents and the veracity of the assertions." The court further explained:

> [T]he Court finds that much of the testimony by [husband] was a moving target. The testimony of [Q.A.] parroted much of [husband's] testimony with some of the same discrepancies. While there were some credibility gaps in [wife's] testimony, on the whole her testimony was more credible. The testimony of [Q.A.] and, especially, of [husband], and the contradictory and confusing documents they provided, lacked credibility.

{¶ 55} The court found that the initial transfer of the Rocky River Drive gas station occurred in violation of a restraining order put in place by the court when wife filed the first divorce action in 2010. The court explained that "despite the documents presented by [husband] and [Q.A.] and in some ways, because of them, the court must find that the value of the business operating at 871 Rocky River Drive is marital."

{¶ 56} In valuing the Rocky River Drive gas station, the court reviewed the testimony of three experts presented by wife, husband, and Q.A. Wife's expert, however, testified that he could not give his opinion as to the value of the business due to the "inaccuracy of the tax returns, the lack of certain documents, and the fact that the documents that do exist do not match up with the alleged transactions." The court noted, however, that it had to assign a value. The trial court ultimately used Q.A.'s expert, valuing the Rocky River Drive gas station business at $306,000. In doing so, however, the court explained that "in choosing this value, the court notes the financial misconduct of the husband in providing documents which were used to create the tax returns upon which this value is based."

{¶ 57} The court also used Q.A.'s expert to value the Pearl Road gas station, which was $207,000. The court also noted for this gas station that it was taking into consideration the "financial misconduct of husband in providing documents which were used to create tax returns upon which this value is based and for failing to provide cash register receipts for either business."

{¶ 58} In dividing the gas stations, the trial court found that it was "not desirable to split the businesses between these parties even if it was appropriate to divest [Q.A.] of title in this court." The court found that selling the businesses would only diminish the properties. The court further found that husband "has engaged in financial misconduct in that he transferred the two gas station businesses with convenience stores and the liquor licenses to his brother to avoid an equitable division of property." The court explained:

> The husband's extreme behaviors to avoid sharing assets with his wife must be considered in this matter as an equitable consideration. His bank statements, credit cards and other financial indicators of lifestyle show that his recorded expenditures did not diminish until this case was underway. Meanwhile, he only paid $229.18 toward his temporary child support which created lack of cash flow for [wife] who was forced to use credit cards and separate property to sustain herself and the children during the pendency of this action.

{¶ 59} The court found the following property in husband's name or possession to be marital: husband's car worth $6,000; Tallan, L.L.C. worth $520,800; Pearl Road, Inc. valued at $207,000; 871 Rocky River Drive, Inc. valued at $306,000; a boat valued at $4,000; and firearms worth $1,850. The court found that the following property in wife's name or possession to be marital: the North

Olmsted home valued at $145,000 (the amount of equity in the home) and wife's pension valued at $5,733. The court concluded that "[a]n equal division of the property based on [its] findings would require husband to pay wife $447,458.50 to equalize them."

{¶ 60} In dividing the marital property, the court awarded wife the marital home, her pension, and Tallan, L.L.C., and awarded husband his car, the boat, and the three firearms.

{¶ 61} The court further explained:

In addition to the above [equalization] figure, [husband] owes [wife] $105,806.40 for the temporary support arrearages through July 10, 2017, plus he owes the state of Ohio an additional $4,038.40 for cash medical. The arrearage of $105,806.40, plus the amount owed to [wife] of $447,458.50 totals $553,264.90. By awarding [wife] all of [husband]'s interest in Tallan, LLC (871 Rocky River Drive), the debt will be paid and the arrearage reduced to $32,464.90, so long as the lien is removed from the property. If the lien remains or is in some way executed upon, then the value of the property in Tallan, LLC would be reduced to $339,712. In which case, [husband] would owe [wife] the full amount of the arrearage, $105,806.40, plus an additional $107,746 ($447,458.50 less $339,712). The division of property as identified above is substantially equal. So long as the property is divided as above and the mortgages of $181,088 are removed, this is not inequitable.

{¶ 62} The trial court also awarded wife $2,000 per month in spousal support for five years as well as child support for the party's minor child and ordered that each party pay the debts in his or her name. The trial court further ordered husband to pay any debt allegedly owed to Q.A. and hold wife harmless for any such debt. The trial court further ordered Q.A. to release the mortgages on the marital home and on the real estate of the Rocky River Drive gas station, which was located

at 871 Rocky River Drive, Berea, Ohio. And the trial court awarded wife $300,000 in attorney fees.

{¶ 63} It is from this judgment that husband now appeals.[5] We will address husband's assignments of error out of order for ease of discussion.

## II. Marital Property

### A. Gas Station Businesses

{¶ 64} In his second assignment of error, husband argues that the trial court abused its discretion when it determined that the Pearl Road and Rocky River Drive gas station businesses were marital property. Husband does not argue that the gas stations were his separate property. Rather, he contends that the evidence he presented at trial established that he transferred ownership of both gas station businesses to his brother and therefore cannot be considered marital property.

{¶ 65} R.C. 3105.171(A)(3) defines marital property generally as property or interest in property that is owned by either or both of the spouses and that was acquired by either or both of the spouses during the marriage. Once a trial court has classified the property as either marital or separate, review of that determination is limited to the standard of manifest weight of the evidence. *Marcum v. Marcum*, 116 Ohio App.3d 606, 612, 688 N.E.2d 1085 (2d Dist.1996). "This standard of review is highly deferential and [only] some evidence is sufficient to sustain the judgment and prevent a reversal." *Barkley v. Barkley*, 119 Ohio App.3d 155, 159, 694 N.E.2d 989

---

[5] Q.A. also appealed the trial court's judgment. *See* companion case *T.A. v. R.A.*, 8th Dist. Cuyahoga No. 107166.

(4th Dist.1997). Moreover, a court has broad discretion to determine what property division is equitable. *Cherry v. Cherry*, 66 Ohio St.2d 348, 421 N.E.2d 1293 (1981), syllabus.

{¶ 66} The manifest weight standard in a civil case is the same as it is in a criminal case. *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, 972 N.E.2d 517, ¶ 17. In *Eastley*, the Ohio Supreme Court explained:

> Weight of the evidence concerns "the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other. It indicates clearly to the [factfinder] that the party having the burden of proof will be entitled to their verdict, if, on weighing the evidence in their minds, they shall find the greater amount of credible evidence sustains the issue which is to be established before them. Weight is not a question of mathematics, but depends on its effect in inducing belief."

*Id.* at ¶ 12, quoting *State v. Thompkins*, 78 Ohio St.3d 380, 678 N.E.2d 541 (1997).

{¶ 67} When conducting a manifest weight review, this court "weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the [finder of fact] clearly lost its way and created such a manifest miscarriage of justice that the [judgment] must be reversed and a new trial ordered." *Id.* at ¶ 20. "In weighing the evidence, the court of appeals must always be mindful of the presumption in favor of the finder of fact." *Id.* at ¶ 21, citing *Seasons Coal Co., Inc. v. Cleveland*, 10 Ohio St.3d 77, 461 N.E.2d 1273 (1984).

{¶ 68} Husband was required to move out of the marital home in June 2010, after wife filed a civil protection order against him. Wife filed for divorce in

September 2010. There was no dispute in this case that when wife filed the first divorce action, both gas stations were marital property.

{¶ 69} Despite the first divorce action against him as well as a temporary restraining order forbidding him to do so, husband, almost immediately, began to try to divest himself of ownership of the gas stations. Husband testified that sometime as early as October 2010, just after wife had filed the divorce action, he sold 49 percent of the Rocky River Drive gas station to Q.A. Again, husband was not permitted to sell or transfer any property pursuant to the temporary restraining order in the first divorce. Indeed, husband testified that he had actually agreed to sell the entire gas station business to his brother at that point, but he decided to transfer it in two steps so that his brother did not lose the liquor license.

{¶ 70} Husband claims that he had to sell the Rocky River Drive gas station to his brother because he ran out of funds to complete the renovation of the gas station. This is after husband had taken out a $120,000 loan for the renovation project in October 2009, using the marital residence to secure the loan. Wife agreed to "subordinate her interest" in the marital home to secure the loan. In January 2010, wife also took $50,000 out of her individual investment accounts to give to husband for the renovation project. Husband never explained where the $120,000 went that he obtained from mortgaging the marital residence. It is also unclear where the $50,000 of wife's annuity was used in the renovations.

{¶ 71} Husband still claims, however, that he ran out of money to finish the project. Skliros testified that he heard husband was having personal issues, which

is why he filed the first improper mechanic lien against the Rocky River Drive gas station. It is telling that Skliros recorded the first mechanic's lien against the property for $635,000 on July 15, 2010, approximately two weeks after husband was ordered to leave the marital residence. Wife then filed the first divorce a couple months later.

{¶ 72} On March 7, 2011, husband entered into the Skliros promissory note for $300,000, which was secured by "real estate located at 871 Rocky River Drive." Wife's divorce action, however, was still pending. Husband and Q.A. claim that Q.A. agreed to pay this $300,000 debt to Skliros as part of his payment for the gas station. Notably, however, the $300,000 note was paid by checks written from the Rocky River Drive gas station account. Brother signed most of the checks to Skliros from this account. It is interesting that the Rocky River Drive gas station account had sufficient funds to pay the Skliros note when husband testified that he could not pay it because he ran out of funds. Husband's reasoning is highly suspect. Further, husband was prohibited from entering into this promissory note pursuant to the temporary restraining order. Although wife dismissed the first divorce action, the trial court could consider it as part of the overall financial misconduct of husband.

{¶ 73} We also find it interesting that Skliros could not identify the $300,000 note and was "confused" by it. In fact, Skliros stated that he had never seen the promissory note before trial.

{¶ 74} At some point after wife filed the first divorce action, husband and wife reconciled. Wife testified that husband talked her into dismissing her

complaint because, among other things, husband promised to go to marriage counseling with her. Wife dismissed her complaint on April 14, 2011. Wife testified that husband went to one session and walked out halfway during the session. Husband did not dispute this fact. Husband never moved back into wife's house.

{¶ 75} Q.A. and husband also testified that Q.A. paid to complete the inside of the gas station business before he even entered into the purchase agreement to buy the business, including some of the outside renovations such as the black top finishing. Q.A. and his wife testified that they sold her gold jewelry to do so, but they did not submit any such proof. Wife, however, submitted checks from the Rocky River Drive grocery account showing that many companies during the renovation were paid from this account, including one where the memo line stated, "black top balance." Husband could not explain why this had occurred.

{¶ 76} Q.A. and husband did not sign a purchase agreement for the Rocky River Drive gas station business until September 14, 2012. Husband stated that this was when he sold the remaining 51 percent of the business to Q.A. Husband submitted a document that was recorded on October 7, 2014, titled "release of mortgage," for the $300,000 note to Skliros. Husband and Q.A. then signed an assignment and assumption agreement, in which husband assigned, and Q.A. assumed, the note to Skliros.

{¶ 77} But notably, the assignment and assumption agreement provides that Skliros Construction Company consents to the assignment and assumption agreement and "agrees to release and discharge Tallan, LLC from the original

March 2, 2011 Promissory Note so long as the existing Mortgage continues to secure the new Substitution Promissory Note." The existing mortgage was "secured by a mortgage on real estate located at 871 Rocky River Drive, Berea, Ohio 44107." Further, the substitute promissory note (where Q.A. agreed to assume the balance of the debt that husband owed Skliros) further provides that "this note is secured by a mortgage on real estate located at 871 Rocky River Drive, Berea, Ohio 44107 owned by Tallan, LLC." Husband owns Tallan, L.L.C. Thus, husband, who was the sole owner of Tallan, L.L.C., still ultimately secured the substitute promissory note from Q.A. to Skliros.

{¶ 78} Husband's sale of the Pearl Road gas station to Q.A. is just as suspect. Husband testified that he decided to sell the Pearl Road gas station to his brother in November 2013 for $150,000 — even though husband had paid $250,000 to Sunoco for the leasehold in 2009 — because husband said that he could not negotiate a lease with Kurt Tober. Husband testified ad nauseam that he and Tober went back and forth with numerous emails and phone calls, trying to negotiate a new lease. Tober, however, contradicted nearly everything that husband testified to. In fact, Tober stated that he was fine with husband paying the original amount of the lease. Husband's entire testimony regarding the sale of the Pearl Road gas station to his brother simply did not make sense.

{¶ 79} In this case, the trial court found that the gas stations were marital property for purposes of its distributive award because it found that husband had committed financial misconduct in attempting to divest himself of any property so

that he did not have to share any of it with wife — despite the fact that it was wife who originally owned the first gas station and despite the fact that wife had transferred title of that first gas station to him for mere pennies compared to what she paid for it. We further note that the trial court did not order any party to transfer title of either gas station to wife. Instead, the trial court awarded wife the real estate of the Rocky River Drive gas station (i.e., Tallan, L.L.C.), which husband undisputedly owned.

{¶ 80} Further, the trial court found that husband and Q.A. lacked credibility. The trial court sat through 14 days of trial and was in the best position to determine the credibility of the witnesses. The trier of fact is best able "to view the witnesses and observe their demeanor, gestures, and voice inflections, and use these observations in weighing the credibility of the proffered testimony." *State v. Wilson*, 113 Ohio St.3d 382, 2007-Ohio-2202, 865 N.E.2d 1264, ¶ 24. The trier of fact may take note of any inconsistencies and resolve them accordingly, "believ[ing] all, part, or none of a witness's testimony." *State v. Raver*, 10th Dist. Franklin No. 02AP-604, 2003-Ohio-958, ¶ 21, citing *State v. Antill*, 176 Ohio St. 61, 197 N.E.2d 548 (1964). Moreover, husband's questionable documentary evidence as well as Skliros's and Tober's testimonies further support the trial court's findings.

{¶ 81} After reviewing the record before us, we conclude that the trial court's findings that the two gas station businesses should be considered marital property for purposes of totaling the marital estate and equally dividing it — despite the fact that the two gas station businesses were titled in Q.A.'s name — were supported by

the record and are not against the manifest weight of the evidence. Again, the trial court did not award wife the two gas stations; it awarded her the real estate on which the Rocky River Drive gas station sits, which husband owned as the sole shareholder of Tallan, L.L.C.

{¶ 82} We further note that not only does the record support the trial court's findings and division of property, the trial court could have, in its sound discretion, awarded wife with a "greater award of marital property" or a "distributive award" — on top of what it awarded her as part of her share of the marital estate — to "compensate" wife for husband's serious financial misconduct. *See* R.C. 3105.171(E)(4) ("If a spouse has engaged in financial misconduct, including, but not limited to, the dissipation, destruction, concealment, nondisclosure, or fraudulent disposition of assets, the court may compensate the offended spouse with a distributive award or with a greater award of marital property.").

**B. Commencement of the Marriage**

{¶ 83} Husband further argues in his second assignment of error that the trial court erred in finding that the marriage commenced on February 10, 2001, rather than when they were legally married. At the crux of this argument, husband maintains that the trial court erred when it determined that wife sold the Pearl Road gas station to him "during the marriage" because wife sold her interest in the Pearl Road gas station to him before they were actually legally married.

{¶ 84} R.C. 3105.171(A)(2)(b) provides the court with authority to select a date other than the ceremonial wedding date for purposes of equitably determining

what comprises the marital estate for a division of property assessment. *D'Hue v. D'Hue*, 8th Dist. Cuyahoga No. 81017, 2002-Ohio-5857, ¶ 48. This statute provides:

> (2) "During the marriage" means whichever the following is applicable:
>
> (a) Except as provided in division (A)(2)(b) of this section, the period of time from the date of the marriage through the date of the final hearing in an action for divorce or in an action for legal separation.
>
> (b) If the court determines that the use of either or both of the dates specified in division (A)(2)(a) of this section would be inequitable, the court may select dates that it considers equitable in determining marital property. If the court selects dates that it considers equitable in determining marital property, "during the marriage" means the period of time between those dates selected and specified by the court.

**{¶ 85}** This court reviews a trial court's determination of a de facto marriage date for an abuse of discretion. *Berish v. Berish*, 69 Ohio St.2d 318, 323, 432 N.E.2d 183 (1982); *Gullia v. Gullia*, 93 Ohio App.3d 653, 666, 639 N.E.2d 822 (8th Dist.1994).

**{¶ 86}** "'The term discretion itself involves the idea of choice, of an exercise of the will, of a determination made between competing considerations.'" *State v. Jenkins*, 15 Ohio St.3d 164, 222, 473 N.E.2d 264 (1984), quoting *Spalding v. Spalding*, 355 Mich. 382, 94 N.W.2d 810 (1959). To find that a trial court abused that discretion, "the result must be so palpably and grossly violative of fact or logic that it evidences not the exercise of will but the perversity of will, not the exercise of judgment but the defiance of judgment, not the exercise of reason but instead passion or bias." *Nakoff v. Fairview Gen. Hosp.*, 75 Ohio St.3d 254, 256, 662 N.E.2d 1 (1996).

**{¶ 87}** In this case, the trial court found:

[Husband] and [wife] were civilly and legally married October 16, 2002. However, they lived together before that marriage for six years. [Husband] was married to [his first wife] during that time, until February 9, 2001. During that time, [husband] had assisted [wife] in selling her grocery store, he had worked at the Pearl Road Sunoco, and was living in [wife's] home. They even had [a] religious marriage ceremony in 1996. This Court cannot say that the legal commencement of the marriage was 1996. However, given their financial relationship and entanglement, it would be inequitable for this Court for the purposes of division of property and the interpretation of "duration of the marriage" to use the date of legal marriage. This Court must commence the division of property in this case after the divorce from [husband's first wife] on February 9, 2001. R.C. 3105.171(A); *Bryan v. Bryan*, [8th Dist. Cuyahoga No. 97817], 2012-Ohio-3691. The parties separated in 2010, but given the facts of this case, the Court cannot find that date equitable, but must use the first day of trial. Therefore, for the purposes of division of property, the duration of the marriage is from February 10, 2001 to July 10, 2016.

{¶ 88} Husband contends that the facts in this case are not analogous to those in *Bryan*, where the trial court determined that the de facto marriage date was six years prior to the date the parties legally married. The husband and wife in *Bryan* moved in together and became engaged six years prior to their legal marriage. The wife in *Bryan* testified that she and husband split the costs of their living expenses. The husband in *Bryan* testified that he paid almost everything. This court affirmed the trial court's decision because the "trial court was presented with two different versions of the parties' financial life prior to being married and concluded that wife was more credible than husband." *Id.* at ¶ 14.

{¶ 89} Here, husband claims that the facts in this case are more similar to those in *Drummer v. Drummer*, 3d Dist. Putnam No. 12-11-10, 2012-Ohio-3064. In *Drummer*, the court determined that there was no reasonable basis to find that the

marriage began six years prior to the date they were legally married. The wife argued

that the trial court erred, relying on a case from this court, *Bradley v. Bradley*, 8th

Dist. Cuyahoga No. 78400, 2001 Ohio App. LEXIS 3028 (July 5, 2001). The court

in *Drummer* analyzed *Bradley* and explained:

> In *Bradley*, the parties became romantically involved in 1979, which resulted in the birth of their son in 1980. After the birth of their son, Mrs. Bradley remained at home to raise the parties' son instead of pursuing gainful employment. On June 22, 1991, the parties had a ceremonial marriage, but never obtained a marriage license. In 1995, Mrs. Bradley filed for divorce. Based on the evidence adduced during trial, the trial court determined that the parties were married at common law on June 22, 1991, and that the duration of the marriage spanned from 1979 to 1995. Mr. Bradley appealed the trial court's decision. On appeal, the court of appeals, noting the trial court's broad discretion on the matter, focused on length of time the parties had been together and the fact that Mrs. Bradley was financially dependent on Mr. Bradley. Based on these facts, the court of appeals determined that the trial court did not abuse its discretion.

> Having considered *Bradley*, we find that it is distinguishable from the present case. In *Bradley*, the parties cohabitated for approximately thirteen years before their common law marriage. Here, William and Shirley cohabitated for approximately six years. In *Bradley*, the parties had a son shortly after they began a relationship and well before their common law marriage. Here, William and Shirley had their first and only child in 1998, nearly four years after their marriage. Last, Mrs. Bradley was financially dependent on Mr. Bradley because she stayed home to raise their son. Here, Shirley was gainfully employed at Taco Bell between 1988 and 1995, and there was no evidence that she was financially dependent on William to the degree Mrs. Bradley was financially dependent on Mr. Bradley. Given these differences, we decline to follow *Bradley*.

> Certainly, the record in the instant case contains evidence that could persuade a trial court that, for purposes of property division, the beginning date of the marriage was prior to July 1994. However, the trial court did not reach that conclusion, finding that William and Shirley married on July 28, 1994. Having considered the record and being mindful of the trial court's broad discretion in determining whether the beginning and ending dates of the marriage are

inequitable, we find that the trial court did not abuse its discretion when it did not select October 1988 as the equitable beginning date of the marriage.

*Drummer* at ¶ 52-54.

{¶ 90} The key to the Third District's decision in *Drummer* and our decisions in *Bryan* and *Bradley* is that this court and the Third District court were affirming the trial courts' decisions because trial courts have broad discretion to determine the beginning and ending dates of the parties' marriage.

{¶ 91} In this case, the parties began living together in the mid-1990s. Husband moved into wife's home that she had inherited from her first husband sometime in 1996, when they were religiously married in a mosque. Husband and wife had their first child together soon after they moved in together. They were financially intertwined. Husband assisted wife in selling her grocery store. He also assisted wife in finding her business partner to purchase the Pearl Road gas station. Husband worked at wife's gas station. The parties held themselves out in their community as husband and wife for six years prior to their legal marriage.

{¶ 92} The trial court has broad discretion to determine what is equitable upon the facts and circumstances of each case. *Kunkle v. Kunkle*, 51 Ohio St.3d 64, 67, 554 N.E.2d 83 (1990). Based on the record before us, we find no abuse of that discretion.

{¶ 93} Husband's second assignment of error is overruled.

### III. Attorney Fees

{¶ 94} In his first assignment of error, husband argues the trial court ordered him to pay "an unreasonable and exorbitant award of legal fees to wife." He maintains that the trial court did not consider all of the proper factors, including (1) his inability to pay, (2) wife's actions in prolonging the divorce, (3) wife's retention of multiple experts to value the property, and (4) the fact that "wife, with little to no assets and only part-time, minimum wage employment incurred nearly half a million dollars in legal fees (which if not foisted on husband, would never, ever be paid)."

{¶ 95} In an action for divorce, a court may award all or part of reasonable attorney fees and litigation expenses to either party if the court finds the award equitable. R.C. 3105.73(A). In determining whether such an award is equitable, "the court may consider the parties' marital assets and income, any award of temporary spousal support, the conduct of the parties, and any other relevant factors the court deems appropriate." *Id.* An award of attorney fees under R.C. 3105.73 lies within the sound discretion of the trial court and will not be reversed absent an abuse of that discretion. *Huffer v. Huffer*, 10th Dist. Franklin No. 09AP-574, 2010-Ohio-1223, ¶ 19. Under this highly deferential standard of review, we "may not freely substitute [our] judgment for that of the trial court." *Dannaher v. Newbold*, 10th Dist. Franklin Nos. 05AP-172 and 05AP-650, 2007-Ohio-2936, ¶ 33.

{¶ 96} Husband cites to *Farley v. Farley*, 97 Ohio App.3d 351, 646 N.E.2d 875 (8th Dist.1994), in support of his argument that the trial court erred when it

failed to determine that he had the ability to pay wife's attorney fees.  In *Farley*, this court held that courts may only award attorney fees in a divorce if it is shown that the payor spouse has a greater ability to pay.  *Id.* at 355.  *Farley* relied on R.C. 3105.18(H), which husband also cites to.  This subsection, however, was repealed in 2005.  *See* Am.Sub.H.B. No. 36, effective April 27, 2005.

{¶ 97}  Former R.C. 3105.18(H) governing attorney fees in a divorce case was contained in the spousal support statute. It provided:

> In divorce or legal separation proceedings, the court may award reasonable attorney's fees to either party at any stage of the proceedings, including, but not limited to, any appeal, any proceeding arising from a motion to modify any prior order or decree, and any proceeding to enforce a prior order or decree, if it determines that the other party has the ability to pay the attorney's fees that the court awards.  When the court determines whether to award reasonable attorney's fees to any party pursuant to this division, it shall determine whether either party will be prevented from fully litigating that party's rights and adequately protecting that party's interests if it does not award reasonable attorney's fees.

{¶ 98} Attorney fees in a divorce case are now contained in R.C. 3105.73, which states:

> In an action for divorce, dissolution, legal separation, or annulment of marriage or an appeal of that action, a court may award all or part of reasonable attorney's fees and litigation expenses to either party if the court finds the award equitable. In determining whether an award is equitable, the court may consider the parties' marital assets and income, any award of temporary spousal support, the conduct of the parties, and any other relevant factors the court deems appropriate.

R.C. 3105.73(A).

{¶ 99}  In enacting R.C. 3105.73, the Ohio General Assembly set forth "a different standard for courts to apply when deciding whether an award of fees is

warranted." *Dunham v. Dunham*, 171 Ohio App.3d 147, 2007-Ohio-1167, 870 N.E.2d 168, ¶ 90 (10th Dist.); *see also Humphrey v. Humphrey*, 11th Dist. Ashtabula No. 2006-A-0083, 2007-Ohio-6738, ¶ 67 ("[T]he latest statute sets out a different standard relating to whether an award of fees is appropriate.").

{¶ 100} Under former R.C. 3105.18(H), before a trial court could award attorney fees to a party, it had to find: (1) the other party has the ability to pay the fees; (2) the party seeking fees needs them to fully litigate his or her rights and adequately protect his or her interests; and (3) the fees requested are reasonable. Awarding attorney fees under R.C. 3105.73, however, is "less burdensome" than the previous requirements of R.C. 3105.18(H). *Dannaher*, 10th Dist. Franklin Nos. 05AP-172 and 05AP-650, 2007-Ohio-2936, at ¶ 22, citing *Karales v. Karales*, 10th Dist. Franklin No. 05AP-856, 2006-Ohio-2963. A court may now award "reasonable" attorney fees if it determines the award is equitable. *Id.* In making the equitable determination, "the court may consider the parties' income, the conduct of the parties, and any other relevant factors the court deems appropriate[.]" *Id.*

{¶ 101} Contrary to husband's claim, unlike R.C. 3105.18(H), "R.C. 3105.73(A) does not specifically require the trial court to consider the parties' abilities to pay attorney fees." *Shetler v. Shetler*, 5th Dist. Stark No. 2008CA00036, 2009-Ohio-1581, ¶ 170. "It also does not contain an explicit instruction to the court to consider a party's ability to litigate his or her rights fully," as the previous statute required. *Heyman v. Heyman*, 10th Dist. Franklin No. 06AP-1070, 2007-Ohio-2241, ¶ 15.

{¶ 102} We therefore disagree with husband that the trial court abused its discretion in this case when it failed to consider his ability to pay wife's attorney fees. Rather, the trial court merely had to determine whether an award of reasonable attorney fees to wife was equitable and, in doing so, could "consider the parties' marital assets and income, any award of temporary spousal support, the conduct of the parties, and any other relevant factors the court deems appropriate." R.C. 3105.73(A).

{¶ 103} In this case, the trial court found that wife incurred attorney fees in the amount of $493,885.93, excluding closing arguments. Wife had three attorneys represent her in the divorce. Two of the attorneys charged $250 per hour, which was less than their current rate. One charged $175 per hour, plus $110 per hour for a paralegal. The court found that attorneys' hourly rates were reasonable based on their "expertise, experience, and function." The court even found that the hourly rates were on the "low end of the range."

{¶ 104} The trial court explained that the issue with wife's large amount of fees was that during depositions and trial, wife had all three or four "of these people in attendance." The court acknowledged that the team "may have been necessary under the circumstances," causing a "higher than usual range." Wife's attorneys agreed to discount the fee by $150,000, which the court reasoned "help[ed] restore the hourly rate into a more usual range."

{¶ 105} The trial court found that there were "unique issues or procedural complexities in this case that [were] complicated by the husband's refusal to

cooperate with discovery, give direct answers at deposition, or recall much of anything during trial." One of wife's attorneys reported that approximately 100 hours of time was expended on husband's bank records, plus one or two hours of deposition questioning simply because husband "refused to provide or acknowledge the bank records." Wife's counsel further provided that "hours were spent prior to trial to obtain stipulations on documents that husband had provided two years" previously. The trial court found that husband's "repudiation of his own documents also occurred during trial." The trial court further found that husband refused to acknowledge that his behavior led to the complexity of the case.

{¶ 106} Based upon its findings, the trial court stated that although husband's fees were reasonable, husband "should not be rewarded for defending his financial and other misconduct." The trial court further found:

> Based on the foregoing, [wife's] attorney fees in the amount of $400,000 are reasonable. In determining the amount of reasonable attorney fees for this case, consideration was given as to whether all the legal services rendered were necessary and whether under the facts of this case the amount of time expended on such services was fully compensable. This reduction is related to the team cost, but not the necessity of the expenditure. The court finds that the husband should be ordered to contribute to the wife's fees. * * * It is equitable that Husband pay $300,000 toward wife's attorney fees and litigation expenses.

{¶ 107} Husband's arguments that the trial court failed to take wife's actions into consideration are unfounded. The court recognized that wife's fees were extraordinary, but found that the discounted amount represented a fair cost when taking husband's financial misconduct into consideration.

{¶ 108} Husband further argues that wife just produced a "laundry list of legal services" rendered. We disagree. The trial court held a hearing on attorney fees, where husband's and wife's attorneys testified at length about their respective fees.

{¶ 109} Husband further argues that the trial court failed to consider wife's delay tactics, stating that even the trial court recognized that "wife pursued this matter 'past reason.'" Husband misrepresents the trial court's statement. The trial court was not referring to attorney fees when it made that statement. Rather, the trial court made that statement when it was attempting to value the gas station businesses based upon the conflicting expert testimony. In doing so, the court explained:

> The opinions and methodologies do not illuminate value for the court to determine, but each in its own way does provide some insight. Whether to manipulate for this case, for tax avoidance, due to sloppy bookkeeping, or some combination of all or some of these reasons, the records provided are not dispositive of the actual profits generated. The belief that the profits are so great has driven [wife] to pursue this matter past reason in that she has expended significant amounts of her separate property to do so. She has withdrawn over $400,000 from her separate property to fund this litigation and to pay her and the children['s] expenses during the pendency.

{¶ 110} Thus, in actuality, the trial court was referring to husband's misconduct in hiding or manipulating documents, which forced wife to pursue the matter "past reason." If wife would not have done so, husband would have gotten away with leaving wife with nothing — despite the fact that it was wife who owned a

grocery store and gas station and who enabled husband to build a business in the first place.

{¶ 111} Moreover, the trial court also sat through the 14-day trial and listened to the testimony. Husband's testimony was maddening. At one point during wife's cross-examination, husband's attorney moved to strike wife's answer as "nonresponsive." The court denied husband's request, stating "[a]gain, if we were going to strike every nonresponsive answer, we would have to strike every answer [husband] said." We could also give countless examples of husband's behavior during trial, which was almost unbearable. Time and time again, husband would not acknowledge documents that his counsel had turned over in discovery. More times than we can count, wife's counsel would ask husband a question that he could have answered by a simple "yes" or "no," but he took ten pages of the transcript to answer and, many times, would still not answer the question. Indeed, there were numerous times that wife's counsel would be forced to move onto another topic because husband would refuse to answer the most basic questions about his own exhibits, bank records, and other business documents.

{¶ 112} Q.A. was not much better. At one point, even the interpreter got frustrated with Q.A., telling the court, "Excuse me, Judge, for the record, it seems like the witness is not capable of understanding the word 'assets,' which is all over the Arabic world." At another point during Q.A.'s cross-examination, the court stated, "[w]ell, this could be done a lot simpler, obviously, if we could just stipulate to some of these documents. This is all going to go to fees at the end of this thing. I

don't know where we are going, but this is ridiculous. Can we not do this the easy way? If you produce this sir, then you say you produced this."

{¶ 113} Husband further argues that the trial court failed to consider the fact that wife made this case complicated by bringing Q.A. into the case and filing multiple claims against him, all which "were rejected by the trial court as a matter of law." We disagree with husband's characterization of the trial court's order. The trial court's dismissal of wife's tort claims against husband and Q.A. did not mean that wife's claims are meritless. It simply meant that the trial court was considering only the domestic relations claims before it. Further, husband is ignoring the fact that it was because of his and Q.A.'s actions of financial misconduct that caused wife to bring Q.A. into the case in the first place.

{¶ 114} This case involved complex business issues that were made more complicated by husband's misconduct. One of wife's attorneys specializes in divorce cases with "significant business issues." Wife's attorney explained that other divorce cases that he has been involved with, including one where there were 300 marital assets and "involved the reorganization of 46 subsidiaries * * * so that the parties could equally divide the marital shares," were "much simpler" than this case because there was no "fraud, or misleading of evidence, or complications that would require you to spend an inordinate amount of time reviewing bank records and other material." For example, wife's attorney explained that during the time that husband said he sold his business because he had no money, "his bank deposits showed that approximately $550,000 of deposits had been made into his personal checking

account. And much of those deposits were from unknown sources." Counsel concluded, "Forensic accounting in a divorce case takes a tremendous amount of time."

{¶ 115} After a thorough review of the record in this case, we find no abuse of discretion on the part of the trial court. Indeed, we find that the trial court's judgment awarding wife $300,000 in attorney fees was reasonable and equitable based on the facts and circumstances of this case. The record clearly establishes that it was husband's extreme financial misconduct, untruthfulness, refusal to turn over discovery, lack of evidentiary support and/or questionable documentation, endless obstructionist testimony (both in his deposition and trial testimony), and his failure to pay temporary support to wife that caused the complexities in this case and resulted in wife's attorneys having to work many more hours than they normally would have in a less complex case.

{¶ 116} Husband's first assignment of error is overruled.

{¶ 117} Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate be sent to said court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27

of the Rules of Appellate Procedure.

_____
MARY J. BOYLE, JUDGE

EILEEN T. GALLAGHER, P.J., and
ANITA LASTER MAYS, J., CONCUR