[Cite as *Moore v. Moore*, 2022-Ohio-1862.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

April Bott Moore,                                  :

      Plaintiff-Appellant/              :
      Cross-Appellee,

                            :                  No. 21AP-276
v.                                                            (C.P.C. No. 16DR-209)

                            :
Robert Dean Moore,                               (REGULAR CALENDAR)

                            :
      Defendant-Appellee/
      Cross-Appellant.                  :

D E C I S I O N

Rendered on June 2, 2022

**On brief:** *Giorgianni Law LLC*, and *Paul Giorgianni*, for appellant/cross-appellee. **Argued:** *Paul Giorgianni*.

**On brief:** *Eugene R. Butler*; *Baker & Hostetler LLP*, *James A. Loeb*, and *Suzanne M. Jambe*, for appellee/cross-appellant. **Argued:** *Eugene R. Butler*.

APPEAL from the Franklin County Court of Common Pleas

NELSON, J.

{¶ 1} April Bott Moore and Robert Dean Moore (given the shared surname, we will call them April and Robert) were married on May 4, 2013. The next year, April gave birth to their daughter. Some two years after that (and well shy of three years after the marriage began), on January 20, 2016, April sued for divorce, and the matter thereafter proceeded on Robert's counterclaim. The trial court granted April and Robert their long-sought divorce in its May 4, 2021 Judgment Entry—Decree of Divorce. April appealed from that judgment entry (a judgment entry she now contends is not a final appealable order), and Robert promptly cross-appealed. Although the litigation has had significantly more staying

power than did the marriage, with the former having run more than twice as long as the latter, we attempt here to err on the side of (only relative) brevity.

{¶ 2} In due course, we will address questions such as the ramifications here of the trial court's having allowed one of April's former lawyers to work on the Judgment Entry in her then-capacity as a judicial law clerk, and whether the trial court erred in concluding that law impelled it to order Robert to pay child support in the amount of $37,710.49 per month (more than $450,000 a year) to support the lifestyle of his then six-year-old daughter. First, however, because it implicates our authority to decide any part of these appeals, we turn to April's suggestion "that this Court may lack jurisdiction over this case." July 23, 2021 Suggestion of Lack of a Final Appealable Order at 1. The Judgment Entry from which she appealed, April submits, did "not divide all of the parties' property as Civ.R. 75(F) requires for a final judgment." *Id.* The 120-page Judgment Entry may be less than a perfect model of clarity in some respects, but we think that a fair reading is that it did allocate the property in a way that we can review.

{¶ 3} April purports to be unclear as to whom the trial court allocated 13 particular assets, *see* Suggestion at 4-5, and she correctly notes that Civil Rule 75(F) generally requires a trial court to divide property of divorcing parties in a final decree, *id.* at 5-7. But when the Judgment Entry is read as a whole, it did that. The Judgment Entry noted that marital property is to be divided equally unless the court finds that result would be inequitable, *see, e.g., id.* at 15; it identified the assets; it then designated the assets as either marital or separate, *see, e.g., id.* at 19-20 (or, as for example in the case of Robert's "second salary bonus," as a mixture of the two, with the specific marital and separate property amounts calculated, *see id.* at 30-32); and it specified those marital assets that were not to be equally divided.

{¶ 4} The rationale and structure of the decree, moving from "Equitable Division" to "Separate Property" to "Agreed Upon Property" to "Disputed Property" and divisions there, was designed to allocate property. *Id.* at 15-52. Read in full, this particular decree with its particular structure and phrasing did allocate the parties' assets with sufficient clarity that it is a final appealable order (consistent with April's notice of appeal). *See, e.g., id.* at 32 (marital portion of specified bank account equally divided, with remaining balance being Robert's separate property), 33 (Robert retains his separate portion of New Albany real property, with marital balance then divided equally), 34 (same result for corporate

account), 35 (awarding April as part of her share of marital property the Aston Martin she used); 52 (court incorrectly assumes that whole of Vero Beach "Olde Doubloon" property is "marital in nature" and consequently orders Robert to pay April half of the appraised $2,600,000 value for her "marital interest in the subject property" he retains).

{¶ 5} Reasonably consistently throughout the decree, with regard to divisible property and except where specified, allocations turned on whether the property was deemed marital or separate. *See*, *e.g.*, *id*. at 111-12 (summarizing "Division of The Marital Estate and Offsets," and noting that with the award of the mostly marital Dublin residence to April and the largely marital Olde Doubloon residence to Robert, "even if the division of the marital estate is not *exactly* equal, it is equitable") (emphasis added); *compare*, *e.g.*, *Klik v. Moyer*, 8th Dist. No. 100576, 2014-Ohio-3236, ¶ 15 ("the 1993 divorce decree provided sufficient information for the parties [and, we would add, courts] to understand the outcome of the case, namely, in the absence of awarding Klik any of Moyer's pensions, [Klik] retained possession of those interests").

{¶ 6} April seems to agree with a reading of the decree that "marital property was to be divided equally unless otherwise stated," Reply Regarding Suggestion at 4, but urges that this at least implicit division is not sufficiently clear for review. In the context of this decree, we disagree. The whole of the trial court's order makes sense only if it is read to allocate separate property as designated and to divide marital property equally except as otherwise indicated. *See*, *e.g.*, Judgment Entry at 19-20 (specifying separate property of April and Robert, and marital property, charting all assets listed in April's Suggestion except for oil and gas leases and the second salary bonus, which it addressed elsewhere); *id*. at 18 (the parties "agreed upon a variety of marital assets totaling $7,408,887 and separate property totaling $3,234,017"); *see also*, *e.g.*, Appellant's [April's] Brief at 45 (arguing that "[t]he Decree awards jewelry to April" on the basis of its designation of that as her separate property).

{¶ 7} The clear import of the trial court's decision was to award the "separate" property to the designated individual. Robert noted in his briefing that April's acknowledgement that the decree awards her the jewelry underscores her understanding of this structure, *see* Appellee's Brief at 33, and April did not contest that point in her Reply. We agree that the same principle governs the other property specified as separate to April or Robert. Thus, for example, we understand the terms of the decree to leave April with her

J.P. Morgan 401(k) account, her Schwab IRA, and her separate shares of the N.Y. Life IRA and PNC account 9039, while leaving Robert his separate portions of his 401(k) account and Chase account 0525, and the Scottrade account.

{¶ 8} We further understand the decree to allocate portions of marital properties equally between the parties unless otherwise specified. For example, in the context of this decree, that is what we see as the whole point of the trial court's exercise in assessing what part of Robert's second salary bonus was derived during the marriage and what part was attributable to work after the marriage had terminated and was therefore "the separate property of [Robert]." *Id.* at 30-32 (designating $224,335 of the second salary bonus as Robert's separate property and identifying the marital portion of that bonus as $255,431).

{¶ 9} Our reading of the actual language of the decree, as opposed, perhaps, to the expectations of the parties if not the trial court, may disadvantage Robert to some limited extent. In opposing April's Suggestion, he urged the interpretation of the decree we take here: assets the trial court identified as either April's or Robert's separate property are left with them, while assets the trial court identified as marital are "equally divided unless otherwise stated" in the decree. *See* Robert's Memo Contra Suggestion at 7. In his Appellee merits brief, however, he maintains that "[t]he trial court's chart [of certain assets, at pages 19-20 of the Judgment Entry] clearly intended, as the parties had specifically agreed, that these assets were to be retained by the party in whose name the assets were titled." Appellee's Brief at 33. We find no such intention expressed in the text of the decree. Robert points to nothing there that would justify the (at least slightly skewed) allocation of specified martial assets that he proposes as Appendix B-1 to his Appellee's Brief. (Interestingly, April's Appellant's Brief provides her own Appendix Balance Sheet, offered in part "to aid the Court's reading of a sometimes inscrutable Decree" and built, she says, on "assumptions * * * as to whom assets are awarded," Appellant's Brief Appendix at 1, with respect to the assets identified in Robert's Appendix B-1, April's attachment mirrors Robert's understanding of to whom the property was to be awarded.)

{¶ 10} The "marital" portions of the 13 assets charted by April's Suggestion as unallocated total $627,211.00. *See* Judgment Entry at 19-20, 30-32. We read the decree as allocating $313,605.50 of that to April and the same amount to Robert. The formulation Robert advances in his Appellee's Brief would give him $333,776.50 of those assets (taking his Appendix B, minus Gemworth, plus half of the marital portion of the second bonus).

Additionally, Robert proposes to receive the full $12,031.00 of a Gemworth account added by April's merits briefing to her list of unallocated "marital" assets (and yet designated by both briefing appendices as for Robert).  Consequently, Robert's newer formulation, as mirrored in April's Appendix, would give him $32,202.00 more of these marital assets than did the equal distribution we find indicated by the decree.  We do not find basis in the decree for reallocating the figures in the way that Robert now suggests:  again, the clear expressed import of the decree is to allocate marital property equally except where otherwise indicated.

{¶ 11} Alleged "oil and gas leases" of "unknown" value, *see* Suggestion at 5, are the only assets implicated by April's Suggestion for which the decree did not specify a value and "separate" or "marital" property characterizations.  We note, however, that the decree did indicate that the parties had stipulated to the value of particular marital real estate to which oil and gas leases may have attached, and said that neither party presented "additional evidence to find that the Oil and Gas leases were not included in that value [of that allocated property]."  Judgment Entry at 42.  That observation does not make the decree less than final.

{¶ 12} In briefing the merits of her appeal, April lists as unallocated one bigger-ticket item that her suggestion did not identify as unallocated:  Huntington Bank Account number 9661, listed by the court as holding $39,871 of Robert's separate property and $4,237,506 in marital property.  Appellant's Brief at 27; *see also* Judgment Entry at 19.  We address that issue now, as April's merits argument implicates the same jurisdictional concerns raised in her Suggestion.  The trial court did not leave that account unallocated, and we read the decree to award all of it, including the marital portion, to Robert.  *See* Judgment Entry at 99 (giving Robert a credit of funds used to pay for Flight Options services used for both parties and April's law firm because "the funds came from an account awarded to [Robert]"); *id.* at 65 (referencing "funds from Huntington National Bank Acct #9661 to pay Flight Options" bill).  Consistent with her Appendix, which lists this account as going in full to Robert, April acknowledges what she calls the trial court's "fleeting and indirect reference to that account," Appellant's Reply Brief at 12, and she predicates her (meritorious) fifth assignment of error on the assumption "that the Decree awards Huntington-9661 to Robert."  Appellant's Brief at 31-32 (then submitting that "the court should have ordered April to pay Robert ***one-half*** of the $435,695.22 [Flight Options bill].

Instead, the court ruled that Robert 'is entitled to a credit' of the entire $435,695.22")
(emphasis in original). April's fifth assignment makes sense only on the understanding that
the account, as already diminished by payment of the private jet service bill, was in the
words of the trial court "awarded to [Robert]." The decree did allocate the bank account.

{¶ 13} We reject April's Suggestion that there is no final order from which she
properly appealed. Thus, we will decide April's appeal and her 18 assignments of error. *See*
Appellant's Brief at xiv-xv. We offer a quick background sketch before addressing each of
April's assignments in turn and then reaching Robert's three assignments of error advanced
on cross-appeal.

{¶ 14} The marriage was short and the couple's relationship "volatile." Judgment
Entry at 9; *compare id.* at 50 (parties "both testified to incompatibility"; April "alleged
domestic violence, which the Court did not find her testimony credible" [sic]). April and
Robert had separate houses and what the trial court termed "a different living
arrangement," with April maintaining a home in Dublin, Ohio and Robert having a home
in Belmont County, Ohio. *Id.* at 9. April "did not go to [Robert's] home very often, and
[Robert] traveled quite a bit for work." *Id.* They "never had a marital residence established
in the traditional sense." *Id.*

{¶ 15} April and Robert "traveled with other individuals or took separate vacations."
*Id.* at 11. The trial court found that despite the limited span of the marriage, both Robert (a
highly compensated energy company executive) and April (an environmental lawyer who
ran her own firm) "were involved in extra-marital affairs." *Id.* at 10. April denied such
conduct on her part, but the trial court discerned "problems with her credibility." *Id.* at 10,
11 (adding detail); *see also id.* at 13 (highlighting April's "deceptive manner * * * in failing
to disclose" a 2017 in vitro fertilization procedure that resulted in a child of whom Robert
is not the father).

{¶ 16} The trial court granted the divorce with an effective date of December 31,
2017. Judgment Entry at 4; *compare id.* at 14-15 (noting January 30, 2016 as de facto
termination date of marriage); July 7, 2017 Entry Granting Defendant's Motion for
Reconsideration at 8, 9 (establishing January 30, 2016 de facto termination date after
finding that evidence of relationship between April and gentleman friend was "wholly
different from the characterization of the relationship provided by [April]"). After the case
was tried in 2016 and 2017, the trial court established that Robert was not the father of the

child born by April in August 2018. Judgment Entry at 5. Before the Judgment Entry issued in 2021, "[t]he [p]arties continued to file so many motions" that the trial court stayed further filings until it could arrive at its decree. *Id*. at 5.

{¶ 17} Among many other rulings, the trial court rejected April's argument that in effect she should be able to lay claim to the more than one million dollars that had come from Robert's bonus checks and been deposited into a bank account under the Ohio Transfers to Minor Act ("OTMA") as designated for the benefit of the couple's daughter. *See id*. at 21-30. That money was "her [own] separate property," April maintained, *id*. at 22, not her daughter's, despite creation of the OTMA account and accompanying notes referencing the daughter's "Harvard account," the accomplished youngster's "Oxford account," and "Harvard/UVA." *Id*. at 22-24; *see also id*. at 24 (noting OTMA account opened with April as "custodian" for daughter, and that on August 10, 2015, April "withdrew $1,000,000 from the minor child's OTMA account and transferred these funds to a savings account in [April's] sole name").

{¶ 18} Lawyer April "contends that she did not understand what type of account she was opening," the trial court remarked, but " '[a] party to a contract is responsible for reading what [s]he signs.' " *Id*. at 25 (citations omitted). April had "knowingly opened the OTMA account," the trial court found, and the first transfer into that account had been "made on the minor child's first birthday." *Id*. at 26-27. Citing R.C. 5814.03(A), the trial court observed that transfer into an OTMA account is " 'irrevocable and conveys to the minor indefeasibly vested legal title.' " *Id*. at 27-28 (emphasis omitted). Finding that the one million dollars April had withdrawn from the child's account was not marital property or April's separate property but rather the property of the child, the trial court ordered the proceeds restrained until further order by the Franklin County Probate Court. *Id*. at 29-30.

{¶ 19} April's credibility was further diminished in the eyes of the trial court by transactions involving a change of car license plates. As we understand the testimony, a man alleged to be April's paramour had been seen driving what was said to be her black BMW automobile, with Ohio license plates of a certain number, into her Florida residence. April later identified pictures of that car bearing a different license plate, but did not then disclose the plates had been changed (by an employee of hers, using a document April had signed). The trial court characterized this event as involving an attempt "to support her testimony that [her friend] had never been to the Vero Beach property. * * * * She made the

change to her license plates in December, and her birthday is in April. She testified that she did not know that Ohioans register[] their vehicles based on the month of their birth. The Court does not find this credible." *Id.* at 11; *see also id.* at 108 (April "changed the license plates * * * to avoid detection that [her alleged boyfriend] had used that car while he was in Vero Beach"); July 7, 2017 Entry Granting Reconsideration at 9 ("while the court was in recess, [April] changed the license plate on the black BMW on December 30, 2016. * * * [H]er actions were done to purposefully conceal information and/or support disingenuous testimony. * * * [S]he has gone to extraordinary lengths to conceal information that is easily ascertained").

{¶ 20} The trial court also noted that April "deducts her personal nanny expenses of over $90,000 per year" from her law firm revenues, a practice her expert conceded is "improper." Judgment Entry at 54 (adding that "[t]he Court is troubled by [April's] tax returns for 2016, which [as of 2021] she 'intends' to file"); *see also id.* at 55 ("even though [Robert] is paying [April] $7,500 per month for the nannies, she is still expensing the payments through her law firm"). And "[n]anny expenses are not the only improper deductions taken by [April] on law firm tax returns"; she "also deducted in 2015 the payments she made to her personal attorneys." *Id.* at 55. "Further seriously undermining [April's] credibility was her claim that she never maintained general ledgers for her law firm" from which she earned imputed annual income of $359,687 from 2013-2015. *Id.* at 56-58.

{¶ 21} In addition to dividing property between April and Robert, the trial court calculated child support. After reciting April's imputed income, the decree described Robert's base income (ranging from $1,800,000 to $3,000,000 per relevant year) and multi-million dollar bonus payments that put his "income for child support purposes" at $7,478,043 per year. *Id.* at 58, 62. The trial court then determined that "the amount of support that would be ordered at the [statutorily benchmarked] $150,000 level" would be $37,710.49 per month. *Id.* at 63.

{¶ 22} The trial court continued its child support determination by assessing the lifestyles of the parties. Because the child now is enrolled in a full-time program at private school (for which Robert pays), the trial court included costs for only one nanny rather than two. *Id.* at 63-64. Noting that the Dublin home was being awarded to April and the Belmont County home to Robert, the decree noted that the child will continue to live in the homes

to which she is accustomed; similarly, Robert would have one of the Vero Beach homes while April would keep the other, leaving the child's vacation prospects much as they were before the divorce. *Id.* at 64. Beyond nannies, the trial court noted, April had estimated the child's needs at (an undocumented) cost of $2,600 per month. *Id.* at 64-65.

{¶ 23} "Other than the trips to Vero Beach and private schooling," the trial court found, "[the child] lives a fairly normal lifestyle." *Id.* at 66. Robert, whom the trial court described as modest in his own spending, had sought to raise the child "as a normal child." *Id.* at 66-67. April had recounted having had a "large Easter celebration where there was a costumed Easter Bunny," but also testified in the main to rearing the child in a non-ostentatious way. *Id.* at 67.

{¶ 24} So the trial court found April's budget of $71,000 a month "extraordinary" and "more related to how [April] would like to live than how [the child] actually lives." *Id.* at 67. And the parties previously had anticipated that the funds from the OTMA account would pay for the girl's college. The trial court rejected April's argument for child support of $100,000 per month, and noted that Robert would continue to pay private school tuition, medical insurance coverage, and other separately specified expenses. *Id.* at 69-70. But, said the trial court (and simply with regard to "the child's day-to-day needs"), the "child support worksheet establishes that [Robert] should pay $37,710.49." *Id.* at 68. That "guideline amount," the trial court stated, "is appropriate" for the then seven-year-old daughter. *Id.* at 70. That portion of the decree further recited that: "The Court will not make the [child support] order retroactive as [Robert] has paid all expenses for the minor child's school, was paying the majority of all expenses associated with ownership of all the marital properties, and has paid $15,000 per month for two nannies to permit [April] to work without interruption." *Id.* at 70.

{¶ 25} April had advised the trial court that she would not seek spousal support, and the trial court did not award any. *Id.* at 79-83 (also noting the short duration of the marriage, that April operates a lucrative law practice, and that she "came into the marriage with a home in Vero Beach, Florida. She is leaving the marriage with that home, plus a home in Dublin, as well as a seven-figure property division").

{¶ 26} The decree reflected a wide variety of other rulings, ranging from determinations regarding alleged economic misconduct by the parties, to the resolution of

marital debts, to attorney fee awards. We will discuss specific rulings in the context of particular assignments of error.

{¶ 27} Trial court proceedings in the case did not end with the decree. April sought a continuance of proceedings to consider various post-decree motions, on the basis that one

> Susan Burnside Kelly was hired by [trial court] Judge Jamison on or about January 4, 2021, to act as her staff attorney. Plaintiff's counsel is aware of Ms. Burnside Kelly's involvement in this matter as she has been in contact with Plaintiff's counsel and was in possession of exhibits and transcripts from the within matter.
>
> Ms. Burnside Kelly was previously employed at The Grossman Law Firm, Plaintiff's prior legal counsel [in the matter], and while employed at Grossman, Ms. Burnside Kelly provided legal services for Plaintiff. Plaintiff is in possession of a billing statement which reflects billing conducted in the within case by Ms. Burnside Kelly while she was * * * an attorney at the Grossman Law Offices.

June 16, 2021 Motion for Continuance at 2.

{¶ 28} The trial court's hearing on the continuance motion elaborated on that recitation. April's counsel represented that "we have a billing statement from Ms. Burnside-Kelly where she billed on [April's] case while at the Grossman law firm, she participated in meetings, did some research, attended a hearing." June 23, 2021 Tr. at 5 (also citing *In re Disqualification of Mason*, 110 Ohio St.3d 1214, 2005-Ohio-7150, ¶ 4: "To be sure, the judge's new staff attorney should not perform any official duties for the judge in * * * any * * * matter in which she served as a lawyer, or in any matters in which a lawyer with whom she previously practiced law served (during her association with the firm)"). Counsel asked the trial court "to let us know if [the court's law clerk] proofread the decision, did research, etc.," in addition to communicating with counsel. June 23, 2021 Tr. at 6.

{¶ 29} At least initially, and without explaining the factual basis for its knowledge or assessment, the trial court was of the view that only Robert "would be the person that would be disadvantaged by Ms. Burnside-Kelly being here." *Id.* at 12. The trial court then disclosed that while the clerk "did no research, * * * she certainly did proofread it. I cannot say that she didn't." *Id.* at 13. "The research," stated the trial court, "was already done by the time that she came." *Id.* at 14. Further, "Ms. Burnside-Kelly was not here during the

trial. She was not here at any time between the close of the trial, December 31st, 2017. She did not come here until January of 2021. She participated in no hearings in this courtroom. She participated in nothing as far as research or anything. She briefly re-read the decree." *Id.*

{¶ 30} Noting again that the clerk had as a lawyer attended a hearing on a motion to quash and participated "in team meetings, did research, [and] communicated with our client," April's counsel identified "a conflict." *Id.* at 15. The trial judge noted that "I was not aware that she worked on this case. That was never disclosed to me by Mr. Grossman or * * * even by Ms. Burnside-Kelly * * *." *Id.* at 16 (although we do not indicate here that would matter under applicable law); *see also id.* at 18 ("I do apologize. It was inadvertent. I had no knowledge that Ms. Burnside-Kelly worked on the Bott Moore case. She did not disclose that to me when she came."). But again, the trial court acknowledged, "I can't say that Susan [as a judicial clerk] never touched this case to review it or to read it or any of those things." *Id.* at 19.

{¶ 31} Although no request for disqualification had been timely made, the trial court said, "I will - - as a courtesy, I will recuse myself." *Id.* at 20. "I don't see how Ms. Burnside-Kelly's presence prejudices Ms. Bott Moore in any way, because the evidence was all submitted prior to Ms. Burnside-Kelly being hired. * * * * But I will recuse." *Id.* at 20. The trial court also noted that a transcript reflected that Ms. Burnside-Kelly earlier had been present as a lawyer for April in the trial court on November 16, 2018 for a matter that "did end up getting continued." *Id.* at 25-26.

{¶ 32} That, then, is the backdrop for April's first assignment of error: "The court erred by permitting the court's law clerk to work on the Divorce Decree and otherwise work on this case despite the fact that the law clerk had been April's attorney in this case." Appellant's Brief at xiv. "The error in this case violated at least the Ohio Code of Judicial Conduct," she submits, *id.* at 6-7: "[W]hen a disqualified law clerk participates in the case, the judge must recuse or be disqualified," *id.* at 13 (citations omitted); *see also id.* at 17 ("situation created a risk of actual impropriety involving compromise of a litigant's attorney-client privilege"). And the "appropriate remedy is vacatur of the Divorce Decree." *Id.* at 18 (emphasis omitted).

{¶ 33} But binding precedent from the Supreme Court of Ohio precludes us from taking that course. In *Beer v. Griffith*, 54 Ohio St.2d 440, 440-41 (1978), where it was "not

clear" that appellees' counsel had been aware of the relationship between the trial judge and his nephew (a lawyer for the opposing side), a court of appeals held that the judge should have been disqualified and declared his judgment void. The Supreme Court reversed that outcome, succinctly: "Since only the Chief Justice or his [or her] designee may hear disqualification matters, the Court of Appeals was without authority to pass upon disqualification or to void the judgment of the trial court upon that basis. * * * [The] judgment, however erroneous, before disqualification is not void. We remand the cause to the Court of Appeals to pass upon the other errors which were assigned." *Id.* at 441-42.

{¶ 34} It matters not that, as April argues, *Beer* was less than unanimous. *Compare* Appellant's Reply Brief at 1 (asserting that "*Beer* was a 4-3 decision," and then relying on the *dissent*) *with Beer* (a 5-2 majority decision, by our count). Whether 7-0, 4-3, or something in between, a Supreme Court majority decision binds us as an inferior court. And April's Reply only underscores that her argument hinges on what she labels a "categorically impermissible conflict of interest" as triggering a need for disqualification. *See* Reply Brief at 4.

{¶ 35} We have explained before that "[t]he Ohio Supreme Court has held that an appellate court has no jurisdiction to vacate a trial court's judgment based on a claim of judicial bias." *Cooke v. United Dairy Farmers, Inc.*, 10th Dist. No. 05AP-1307, 2006-Ohio-4365, ¶ 45, citing *Beer* at 441-42. "[A]n appellate court is without authority to pass upon issues of disqualification or to void a judgment on the basis that a judge should be disqualified for bias or prejudice." *Id.* (citations omitted) (adding "we lack authority to assess Cooke's claim that the trial court's disposition of his claims was the result of bias and prejudice," and later overruling his assignment of error).

{¶ 36} We therefore are not in a position to assess matters such as the trial court's screening procedures or other conflict issues, and we cannot provide either the disqualification determination or the "remedy" that April seeks. Because April's first assignment of error asks us to undertake an analysis outside of our authority, we overrule it on that basis.

{¶ 37} That makes moot Robert's motion asking us to dismiss April's first assignment of error in light of April's having recorded the divorce decree with the Franklin County Recorder prefatory to transfer of certain real estate into her name alone. *See* January 21, 2022 Motion to Dismiss Appellant's First Assignment at 4 (advising that "[a]s

a result," the Recorder has transferred to April parcels of real property awarded to her in the decree). We deny Robert's motion as moot, and in keeping with the Supreme Court's instructions in *Beer*, we proceed to review the remaining assignments of error.

{¶ 38} April's second assignment of error urges that the trial court "erred in setting the marriage-termination date." Appellant's Brief at xiv. As April acknowledges, we review that ruling for abuse of discretion. *See* Appellant's Brief at 20, citing *Berish v. Berish*, 69 Ohio St.2d 318, 320 (1982) (observing that trial court must have discretion in reviewing the facts of each case to determine what is equitable).

{¶ 39} On the record of this case, we cannot find that the trial court abused its discretion in setting the January 30, 2016 de facto termination date (of some four months after April retained divorce counsel). April quibbles about such things as the extent to which the record supports the trial court's characterization of the parties' relationship as "volatile," and questions the trial court's emphasis that the parties " 'lived separate[ly] for months before the filing of the complaint.' " Appellant's Brief at 22, 23 (quoting Judgment Entry at 9). But there is evidence in the record to support the trial court's conclusion, for example, that April and Robert both by that point "were involved in extra-marital affairs," Judgment Entry at 10, and April's point that "at no point in the marriage did the parties reside in the same house," Appellant's Brief at 23, might in this context be said to support an earlier de facto termination date rather than a later one.

{¶ 40} As the Judgment Entry reflects, the de facto termination date was the subject of two different hearings and the trial court's July 7, 2017 Entry Granting Defendant's Motion for Reconsideration. Judgment Entry at 8. April does not directly contest here the trial court's observation that her conduct from the fall of 2015 on did not evidence attempts to reconcile with Robert. *Compare*, *e.g.*, July 7, 2017 Entry Granting Reconsideration at 7. And while April disagrees with the trial court's conclusions that she was having an affair and that she "had an illicit motive (hiding her 'relationship' * * *) in changing the license plates on her BMW," Appellant's Brief at 24-25, she does not attempt a showing that the trial court erred in noting that the evidence (including witness and cell phone evidence) of the extent of her connections with the gentleman in question "is wholly different from the characterization of the relationship provided by [April]," *see* Entry Granting Reconsideration at 8 (reviewing evidence). Nor does April's stated disagreement with the

trial court's conclusions about events surrounding the changed license plates mark the trial court's findings as unsubstantiated.

{¶ 41} The trial court did not abuse its discretion in finding that the equities of this case counseled moving from the date of final hearing to January 30, 2016 as the de facto termination date of the marriage. And April's argument that "[t]he Moores were not separated for * * * even three years, as in *Tincher* [*v. Tincher*, 5th Dist. No. 2019 CA 28, 2020-Ohio-3352, involving a marriage of roughly two and a half decades]," April's Reply Brief at 6, is of especially little salience here, where April retained divorce counsel only two and a half years after she and Robert married. We overrule April's second assignment of error.

{¶ 42} April's third assignment of error is that "[t]he court failed to divide all of the marital property," and her fourth assignment is that "[t]he court failed to explain the division of property with specificity and clarity sufficient to enable appellate review." Appellant's Brief at xiv. These assignments parallel April's Suggestion, which we have rejected. We overrule her third and fourth assignments of error for the same reasons that we turned away her Suggestion, and we proceed with our review.

{¶ 43} As foreshadowed, April's fifth assignment of error is that "[t]he court erred by allocating to April 100 percent of the Flight Options marital debt, which should be allocated between the parties 50-50." Appellant's Brief at xiv. We agree. The trial court found that the Flight Options bill was largely "marital debt," Judgment Entry at 99. Robert paid it from the Huntington account later awarded to him, so as April concedes, she should have been assessed for her half. In ruling on this assignment, we are not swayed by Robert's argument that another trial court determination, which he did not include in his own assignments of error, should count as a partial offset of this one. *Compare* Appellee's Brief at 39-40. We sustain April's fifth assignment of error.

{¶ 44} April's sixth assignment of error contends that "[t]he court miscalculated the marital portion of Robert's Second Salary Bonus Plan deferred compensation." Appellant's Brief at xiv. It didn't. More precisely, the decree on this score was not contrary to the manifest weight of the evidence. *Compare Habtemariam v. Worku*, 10th Dist. No. 19AP-47, 2020-Ohio-3044, ¶ 45 (" 'We review a trial court's determination of property as marital or separate under a manifest weight standard, and we will affirm a trial court's

determination if it is supported by some competent, credible evidence.' *Roush v. Roush*, 10th Dist. No. 15AP-1071, 2017-Ohio-840, ¶ 18") (further citation omitted).

{¶ 45} The trial court here adopted the competent, credible coverture analysis of Robert's expert Robert Ranallo, in combination with the bonus plan description provided by the testimony of the Controller for Robert's then-employer. *See* Judgment Entry at 30 (with citations to expert report). In a nutshell, the bonus plan provided for one-third of the bonus to be paid when the bonus was announced, but Robert was not eligible for the next third until he worked for one additional year, and was not eligible for the final third until he had worked for one more year after that. Judgment Entry at 30. As the trial court described, "Ranallo's coverture analysis [for dividing the bonus into its marital and separate property components] uses the number of months worked while married and the total number of months worked to earn the bonus [chunks], including the months worked after the marriage ended." *Id.* at 31. The expert, for example, "concludes that the payout of the third payment of the 2014 Second Salary Bonus in 2016 [after the marriage had terminated] would be 61.81% marital and 38.19% separate." *Id.* Under this approach, the "marital portion" at issue "is $255,431 and [Robert's] separate property portion is $224,335." *Id.* at 32.

{¶ 46} April does not claim a math error, or even dispute the logic of the underlying formula. Rather, she urges simply that the bonus was "earned" entirely during the marriage (with payments just "deferred") because it was announced as awarded within that time, despite the undisputed fact that (barring illness or injury) Robert needed to work well after the marriage had ended in order to qualify for the full bonus amount. *Compare* Appellant's Brief at 32-38 (implying that the full amount was " 'acquired * * * during the marriage' ") *with* Judgment Entry at 30 (bonus "vests ratably over three years").

{¶ 47} April's reliance on *Kaechele v. Kaechele*, 35 Ohio St.3d 93 (1988), is misplaced. *Compare* Appellant's Brief at 35-37; Appellant's Reply Brief at 14, 15. That was an "alimony" (spousal support) case that "center[ed] on the alleged failure of the trial court to weigh the [ongoing receipt of a] bonus in making its alimony award." *Id.* at 96. If not considered as part of the division of property, the bonus (either prospectively or when received) was a factor to be taken into account in setting support levels, just as ongoing salary for future work would be: "The [bonus] contingencies are essentially the same as those attendant to appellant's receipt of future salary." *Id.* (also noting at 97 that "the court

of appeals would have been correct in finding abuse of discretion if the award by the trial court foreclosed appellee from seeking adjustments when (and if) the bonus payments are received by appellant"). The Supreme Court could not tell whether or how the trial court had considered the bonus, and remanded to the trial court for disposition. *Id*. at 97. That is not at all this case, where the trial court *did* consider the bonus and follow expert guidance in designating which portions were marital and which portions were separate property. *Compare* Judgment Entry at 30-32 *with* R.C. 3105.171(A)(3)(a)(ii) defining "marital property" to include any interest "acquired * * * during the marriage").

{¶ 48} As based on bonus plan documents and the Ranallo expert analysis, the trial court's determination here is not against the manifest weight of the evidence: we overrule April's sixth assignment of error.

{¶ 49} April posits in her seventh assignment of error that "[t]he court erred in valuing, and allocating the proceeds of the sale of, the New Albany house." Appellant's Brief at xiv. Under this assignment, she argues first that the court should have used a 2016 appraisal value of the Tensweep, New Albany house, rather than its actual 2020 sales price; that "the $450,000 diminution in value between the 2016 valuation and the 2020 sale" should "favor April, because it was Robert's responsibility to maintain the house"; and that the trial court in any event erred in calculating Robert's separate property interest in the house on the basis of the sale price rather than net proceeds, thereby awarding him $4,143 too much. Appellant's Brief at 41.

{¶ 50} Robert argues that April did not timely object to the use of the sale price and the allocation, and that he should not be made the "guarantor" of the appraised value. Appellee's Brief at 45-46. But he does not point to any agreement as to the asset valuation - - apart from the Joint Exhibit 1 that he says elsewhere in his briefing is "a balance sheet that reflects the parties' respective positions on the division and value of assets," Appellee's Brief at 31. That 2017 Joint Exhibit reflects the 2016 appraised value of $1,650,000 as the "current value" as of August 2016 for that house, with (Robert's) separate interest in the property specified as $81,840. (The decree itself recited that "[b]ased upon the appraised value of the real estate agreed upon by [April], * * * the separate property of [Robert] is 4.96% ($81,840/$1,650,000 = .0496)." Judgment Entry at 33.) After noting that the parties had agreed that Robert was entitled to reimbursement for $35,000 in repairs to the

house, and calculating his separate interest now at $59,520, the trial court split the balance of the 2020 sale proceeds between the parties. *Id.* at 2-3, 33-34.

{¶ 51} In *Kramer v. Kramer,* 10th Dist. No. 18AP-933, 2019-Ohio-4865, ¶ 34, we held that "the trial court abused its discretion when it determined that the value of the marital residence would be the eventual sale price, rather than the value on the date of de facto marriage termination. Generally, 'a trial court should consistently apply the same set of dates when evaluating marital property that is subject to division and distribution in a divorce proceeding.' " *Id.*, quoting *Kachmar v. Kachmar,* 7th Dist. No. 08 MA 90, 2010-Ohio-1311, ¶ 47. We emphasized that we have "previously held that a trial court abuses its discretion when it chooses a division date that occurs after the end of the marriage." *Id.* at ¶ 34, citing *Crowder v. Crowder,* 10th Dist. No. 98AP-1124 (Aug. 5, 1999), and noting that *Crowder* had remanded that case to the trial court to value the residence as of the marriage de facto termination date).

{¶ 52} Robert attempts to distinguish *Kramer* on the basis that it involved a prospective rather than an actual sale, but that distinction is not in keeping with the logic of the decision. And the case he cites of *Janosek v. Janosek,* 8th Dist. No. 86771, 2007-Ohio-68, ¶ 65, does not appear to involve anything like the four-year lag between marriage termination and real property valuation at issue here. Nor does the record support Robert's waiver argument. The parties agreed in 2016 to have the house appraised, and that it would be sold with the proceeds held in escrow, but that was not an agreement as to the asset valuation or valuation date. *See* October 18, 2016 Agreed Judgment Entry—Pretrial Appraisals and Trial Stipulations at 1, 2.

{¶ 53} Robert's January 28, 2020 Notice of Sale and Motion for Allocation of Proceeds at 4 asked the trial court to "determine the separate property and marital property components of the balance of the Tensweep proceeds." During discussion of that motion in the trial court on March 3, 2020, April raised the de facto termination date issue:

> [April]: * * * * So at the de facto, don't you need to determine who owns what property?
>
> THE COURT: As of the date of the de facto, that's true.
>
> [April]: Correct. So they are asking for a new de facto date. They are asking now for a de facto date of January 24th of 2020 for the New Albany house. * * * * No. If they want that [date], I

will take it for everything. If they don't, then you need to make some decisions about the division of the property. And, Your Honor, he has rundown [sic] this property. It is a mess.

March 3, 2020 Tr. at 23. During trial court proceedings on June 16, 2020, April again argued that "[t]he de facto date in this case was January of 2016. That sets the value of the house at $1.65 million." June 16, 2020 Tr. at 245-46. And the trial court observed that "[t]here has been an argument between the two of you about the value of the home for quite some time." *Id*. at 246. The trial court's Entry/Interim Order of June 22, 2020 specifically noted that "[t]he Parties did not reach agreement on the division of the remainder of the funds" from the house sale. Entry/Interim Order at 1.

{¶ 54} Robert is incorrect in suggesting that April " 'failed to raise the issue before the [trial] court.' " *Compare* Appellee's Brief at 45 (quoting *Kessler v. Kessler*, 10th Dist. No. 09AP-740, 2010-Ohio-2369, ¶ 9). We sustain April's seventh assignment of error: On remand, the trial court should establish a value for the New Albany property as of the 2016 de facto termination date and adjust the related allocations as it then finds appropriate.

{¶ 55} In her eighth assignment of error, April urges that "[t]he court misapplied the law controlling the question of whether Robert gifted two checks to April thereby rendering them April's separate property." Appellant's Brief at xiv. Through this assignment, April again seeks to lay claim to the more than one million dollars that had been set aside for the Moores' young daughter (and her prospective college education) pursuant to the OTMA. But a custodian is not entitled to raid a custodial account that has been established for the benefit of a child. *See, e.g., Durisala v. Durisala*, 1st Dist. No. C-130830, 2014-Ohio-5229, ¶ 21 ("A custodial account that is held for the benefit of a child is solely the property of the minor child and is neither marital property nor separate property of the child's parents"; adding, consistent with the ruling of the trial court here, that "[f]urthermore, the Ohio Uniform Transfers to Minors Act provides that any changes to or regulation of custodial accounts must be made by a probate court, rather than a domestic relations court"). We do not venture to speculate on whether that money ultimately will be directed toward "Oxford," "Harvard," or "UVA," as April's various notes anticipated, *see* Judgment Entry at 22-24, or perhaps to some other endeavor, but we discern no error in the trial court's rejection of April's contention that she "did not understand what type of account she was opening" for her daughter, *see id*. at 25, or the trial court's understanding that April and

Robert intended the money to benefit their child. We overrule April's eighth assignment of error.

{¶ 56} April's ninth assignment of error reads: "The court erroneously ordered April to pay Robert $36,670.36 to reimburse marital money expended to pay the separate-property portion of April's 2013 federal income tax liability." Appellant's Brief at xiv. April argues here that her tax debt of $107,854 for 2013 was paid from marital property: She does not contest that $36,670.36 of that amount was her separate debt, but urges that given the payment from marital funds, she should have been ordered to pay Robert only $18,335.18 rather than double that amount. Appellant's Brief at 44-45. Robert counters that the trial court's allocation here was not against the manifest weight of the evidence because the tax payment had come from money that was "mostly [his] separate property." Appellee's Brief at 49; *compare* October 14, 2016 Tr. at 260 (Robert's expert Ranallo answers "[t]hat's correct" when asked on redirect examination whether if the payment "came out of a joint account to pay a separate debt, that means that marital money was used to pay for the separate debt of April * * *"). We sustain April's ninth assignment of error regarding this $18,355.18.

{¶ 57} April asserts in her tenth assignment of error that "[t]he court erred by valuing jewelry." Appellant's Brief at xiv. The parties had agreed, April says, that personal property was not to be appraised, and the decree erred in valuing the award of jewelry to her at $141,917 "for no reason." Appellant's Brief at 45. Again, this assignment recognizes the trial court's intent to allocate the parties' separate property to the respective holders. April is wrong to claim that the trial court had "no reason" for its valuation: the figure came from her own evidence of jewelry appraisals and payments. *See* September 8, 2017 Tr. and April's Ex. VV. Moreover, the decree suggests that personal property valuations were not taken into account to affect the division of marital property, *see* Judgment Entry at 20, fn. 3, and April does not make an argument outside the specifics of her particular assignments of error as to why the award was somehow inequitable. We overrule April's tenth assignment of error.

{¶ 58} April's eleventh assignment of error asserts that "[t]he court erred by finding that April denied Robert access to Olde Doubloon and, based upon that finding, awarding Olde Doubloon to Robert." Appellant's Brief at xv. This assignment relates to one of the two Vero Beach, Florida properties addressed by the decree: The trial court awarded Olde

Doubloon to Robert, while neighboring Olde Galleon, which April had owned before the marriage, remained with her. *See* Judgment Entry at 52 (Robert ordered to pay April $1,300,000 [sic] for her marital interest in Olde Doubloon property); 83 ("[April] came into the marriage with a home [Olde Galleon] in Vero Beach, Florida. She is leaving the marriage with that home, plus a home in Dublin, as well as a seven-figure property division"); 87, 100 (Olde Galleon refinancing is April's "separate debt"); 111 (awarding Olde Doubloon to Robert "to achieve an equitable division of assets and because of equitable considerations, especially the lack of access by [Robert] as a result of [April's] conduct"). April's one-paragraph opening brief argument in support of this assignment takes issue with the trial court's "speculative" fact-finding. *Compare* Appellant's Brief at 46 (adding, without citation, that "[t]he conduct of the guards in denying Robert access to his own home was their doing, not April's") *with* Judgment Entry at 98-99 (noting testimony that Robert could hear April speaking with gatehouse guard and "was thereafter denied entrance" when "just one word to the guard would have resolved the entire problem"), 111.

{¶ 59} April points to nothing to belie the trial court's conclusion; the evidence permits the trial court's finding. Significantly, too, the trial court's award of the property to Robert (upon payment to April of one-half of what the court said was the marital interest of $2,600,000) looked to equitable considerations not limited solely to the guard incident. *See* Judgment Entry at 111 (looking to equitable division of assets and to equitable considerations including "especially" that incident). Robert used the property, and we find no reason to gainsay the trial court's award of it to him. We overrule April's eleventh assignment of error.

{¶ 60} April's twelfth assignment of error states that "[t]he court failed to award April her clothing and other goods located at Barkcamp [Park Road, the Belmont County house in which Robert lived]." Appellant's Brief at xv. But Robert testified that April had removed her personal property from that home. October 6, 2016 Tr. at 47 ("she had everything bagged up and taken out. What was left was trash that she had set by the door"). His brief pointed that out, and the trial court was entitled to credit his testimony. April does not revisit the assignment in her Reply Brief. We overrule April's twelfth assignment of error.

{¶ 61} April's thirteenth assignment of error is that "[t]he court vaguely and/or erroneously ruled regarding 'separate debts.' " Appellant's Brief at xv. The decree specifies:

"Except as otherwise provided herein, all expenses separately incurred by the Parties in their own names since the end of the marriage (January 30, 2016) shall be the sole responsibility of the Party incurring said expense and said Party shall pay and hold the other harmless on said obligation." Judgment Entry at 100. April's one-sentence quibble with that catch-all language is that she "fears" that Robert might invoke it to escape payments "he agreed to make under the June 13, 2016 Agreed Entry" (regarding bills for her Dublin home). Appellant's Brief at 47. Robert responds that this portion of the entry is neither ambiguous nor prejudicial to April, that the entry to which April refers was modified by a January 8, 2020 Amended Magistrate's Order, and that the final decree had, in fairness because the Dublin property was awarded to April, returned to Robert certain payments he had made (from separate, post-marital earnings) in connection with that Dublin home. Appellee's Brief at 53-54 (quoting Judgment Entry at 100). April makes no mention of this assignment in her Reply Brief. April's thirteenth assignment of error lacks merit, and we overrule it.

{¶ 62} We take April's related sixteenth assignment of error out of turn to overrule it, too. There, April postulates that "[t]he court erroneously ruled that Robert 'shall receive and therefore deduct from [April's] property division all payments he made under the temporary orders for [April's] Dublin Home  * * * .' " Appellant's Brief at xv, quoting Judgment Entry at 100. As with her thirteenth assignment, April fails to rebut Robert's response in her Reply Brief, and we find no abuse of discretion in the trial court's judgment on this matter.

{¶ 63} April's fourteenth assignment of error postulates that "[t]he court erred by ordering April to 'reimburse [Robert] $20,000 for the two checks.' " Appellant's Brief at xv. April here refers to two checks drawn September 10, 2015 on (joint, marital) Huntington Bank account 9931 and totaling $20,459.99. *Id.* at 48; Judgment Entry at 19, 92; Joint Ex. 1 (reflecting marital account). As noted in the memo line of the checks, April wrote them as "reimbursements" for expenditures that Robert had made in connection with a trip to New York City for his "girlfriend" (*see* Judgment Entry at 95) and her family and for a rug that he had purchased for the woman's home. Judgment Entry at 92; Appellant's Brief at 48. Noting that the checks were written after April had retained counsel (in August 2015) to reach a divorce settlement, the trial court found that the checks' reimbursement references showed April had "wrongful scienter and was attempting to dissipate the assets

because she was angry about the alleged affair." Judgment Entry at 92. The trial court ordered April to reimburse Robert $20,000 for the two checks. *Id*. at 93.

{¶ 64} April submits that she deposited the larger of the two checks into a bank account used to defray household expenses, and so did not dissipate the marital estate by that amount, but she concedes that her evidence on that point "is not in the record," Appellant's brief at 49, fn. 7. Our review on appeal is confined to the trial court record with which we are presented, and we cannot consider the stray "discovery document" that April now offers. *See, e.g., Blevins v. Blevins*, 10th Dist. No. 14AP-175, 2014-Ohio-3933, ¶ 14 (" 'Appellate review is limited to the record as it existed at the time the trial court rendered its judgment.' * * * * 'A reviewing court cannot add matter to the record before it, which was not a part of the trial court's proceedings, and then decide the appeal on the basis of the new matter.' ") (citations omitted).

{¶ 65} April argues further that the trial court went against the manifest weight of the evidence in concluding that April had redirected marital assets to herself. Appellant's Brief at 50. On this record, however, the trial court was within its authority to reach that conclusion.

{¶ 66} More powerfully, April argues that while R.C. 3105.171(E)(4) permits a domestic relations court to "compensate" a spouse aggrieved by financial misconduct, the trial court's ruling here was unduly punitive. Appellant's Brief at 51-54. The "cruel irony" of the trial court's ruling here, she notes, is that "[i]t imposes upon April nearly all of the cost of [the other woman's] rug and her New York City frolic with April's husband." *Id*. at 54. We grant that resort to self-help, however emotionally understandable in this particular context, cannot excuse dissipation. But the trial court's expressed intent was curative, not punitive: its order was that April "*reimburse* [Robert] $20,000 for the two checks with the memo." Judgment Entry at 93 (emphasis added). Our reading of the trial court's ruling is that it was designed to "compensate [Robert] with a distributive award," not to bestow upon him "a greater award of marital property." *See* R.C. 3105.171(E)(4). Because the checks were drawn on a joint checking account that the trial court designated as marital property, *see id*. at 19, the intended reimbursement would be accomplished by April's payment to Robert of his half of the funds at issue—here $10,000 of the (rounded) $20,000 cost of the New York City getaway and the rug for Robert's friend's home. To reconcile the trial court's

order with what the trial court said it was doing, we sustain April's fourteenth assignment of error only to the extent of that modification.

{¶ 67} April's related fifteenth assignment of error urges that "[t]he court erroneously failed to find that Robert's expenditures on [his woman friend] constituted dissipation of marital property." Appellant's Brief at xv. "The [trial] court should have ruled that at least *some* of [Robert's] expenditures [claimed to relate to this extramarital affair] constituted dissipation of marital funds," April submits; to that unquantified extent, she posits, the trial court's ruling went against the manifest weight of the evidence. *Id.* at 55 (emphasis in original).

{¶ 68} Both April and Robert claimed that the other had engaged in financial misconduct by expending marital funds in pursuit of extramarital affairs. Judgment Entry at 91. (We succumb to our own temptation here by noting the potentially relevant fact that April's alleged paramour was the former boyfriend of Robert's girlfriend, and the self-acknowledged father of that woman's child. February 16, 2017 Tr. at 457; *see also* Cross-Appellant's Brief at 2, fn. 1. The trial court applied the same standard to each side, reciting its understanding of precedent that financial misconduct does not arise under R.C. 3105.171(E)(4) unless the improper spending is intended to defeat the other spouse's interest in property or profit the spender, or affects the parties' chosen lifestyle. Judgment Entry at 90, 93. In part on that basis, for example, and even though April's "rendezvous with [her own friend] were preceded by * * * cash withdrawals" that totaled "$27,000 during the marriage in cash just prior to these trips," withdrawals for which April "offered no explanation" and that came while "the Parties were engaged in negotiation to settle the divorce," and on the evidence presented, the trial court ruled that it "cannot find that [April's] intent to dissipate is proven." *Id.* at 91-92.

{¶ 69} April's argument under her fifteenth assignment of error does not take issue with the trial court's analytical framework under which the competing claims largely washed out, so we do not parse that analysis here. *See, e.g.*, *McGowan v. Stoyer*, 10th Dist. No. 02AP-263, 2002-Ohio-5410, ¶ 23 ("This court cannot and will not make appellant's argument on his behalf") (citation omitted). April does not confront the trial court's assessment that "[t]here is no evidence that [Robert's] spending impaired the Parties' lifestyle in any fashion, no financial misconduct is present." Judgment Entry at 94 [sic]; *see also id.* at 95 (no showing that Robert's expenditures on lottery tickets, "adult products,"

and alcohol "either were intended to defeat [April's] interest in marital property or that the amounts affected the Parties' lifestyle"). Her assertion that "Robert agrees that about ten percent of his expenditures on [his friend as] proved at trial constitute financial misconduct," Appellant's Reply Brief at 20, citing Appellee's Brief at 57-58, is wrong: Robert makes no such concession in the designated portion of his brief, but rather points to the amorphous nature of much of April's document submission and to the trial court's finding that " 'nearly 90% of [April's] claims are for conduct by [Robert] which occurred after the *de facto* termination date of the Parties' marriage and are therefore irrelevant." Appellee's Brief at 57, quoting Judgment Entry at 94. Because April does not make out her argument that the trial court went against the manifest weight of the evidence in finding that April failed to establish financial misconduct by Robert, *see* Appellant's Brief at 55, and noting that April does not specify here the particular amount of financial misconduct that she claims to have established, we overrule her fifteenth assignment of error.

{¶ 70} In her seventeenth assignment of error, April states: "The court refused to enforce Robert's agreement to pay car insurance." Appellant's Brief at xv. She refers to that part of the decree that recited that Robert "has no obligation to pay for a vehicle owned by [April's] business. [April] was ordered to pay her own personal expenses which insurance for her vehicles would be characterized as personal expense." Judgment Entry at 90 [sic]; *compare* Appellant's Brief at xv (citing to that part of the Judgment Entry). Robert responds that insurance for a vehicle owned by the Bott Law Group was not covered by the agreed entry that April cites and that the agreed entry "was modified because 'the parties * * * agree that the current temporary order structure is unworkable, inequitable, and the cause of ongoing litigation.' " Appellee's Brief at 59, citing January 8, 2020 order at 1 (and at 3, assigning to April "all costs associated with any automobile in her name or the name of her business, including the insurance and maintenance costs"). April does not respond to these arguments or in any way return to this assignment of error in her Reply Brief. Having examined the record in this regard, we overrule April's seventeenth assignment of error.

{¶ 71} April denominates her final assignment of error as "Qualified Assignment of Error 18." Appellant's Brief at 59. After that heading, it reads: "The court erroneously calculated April's income for purposes of child support based upon her gross business revenue rather than her net business income." *Id.* The gist of the assignment is that the

trial court "deemed April's annual income to be $359,687" because it mistakenly relied on the "cash flow" of her law practice rather than looking to the business's "net income." *Id.* The assignment is "qualified" because April "is not challenging" the bottom line of the child-support award calculations. *Id.* She wants to flag the trial court's analysis of her income, however, lest "any future calculation of child support" be required. *Id.*

{¶ 72} We determine below in sustaining the first assignment of error from Robert's cross-appeal that recalculation of the child support order is required. We attach no preconditions to that reassessment, and the trial court will be able on remand to give all appropriate consideration to the child support matter. We therefore overrule April's eighteenth assignment of error as moot.

{¶ 73} Robert does contend in his cross-appeal that the trial court went off the rails in awarding child support of $37,710.49 per month for the then seven-year-old child, and he identifies how that happened. His first assignment of error reads: "The trial court erred as a matter of law and abused its discretion in awarding child support of $37,710.49 per month and in making that excessive award retroactive to January 1, 2020." Cross-Appellant's Brief at v (capitalizations adjusted).

{¶ 74} $37,710.49 is not only a large figure, it is quite precise. And the trial court was plain as to how it arrived at that amount: It believed itself constrained by the calculus it reached on a worksheet. But the trial court erred as a matter of law in believing itself required to use the numbers it did as the worksheet's starting point, so it got a worksheet result that it wrongly construed as establishing a preliminary baseline (of exactly $37,710.49 a month) for child support.

{¶ 75} The law, and the trial court's misunderstanding, are pretty plain. The trial court devoted a subsection of its Judgment Entry to the "Child Support Worksheet." Judgment Entry at 63. Because the hearing "started in October 2016," the trial court was looking to the incomes of the parties for one year before that, *id.* at 53, and it used the pre-March of 2019 version of R.C. 3119.04 ("Determination of support obligation where combined gross income is greater than or less than amounts covered by schedule") that was in effect during the course of the hearing, *see id.* at 52, 63 (referencing statutory "$150,000 level"). At that time, R.C. 3119.04(B) instructed (with emphasis added):

> If the combined gross income of both parents is greater than
> one hundred fifty thousand dollars per year, the court, with

respect to a court child support order * * * shall determine the amount of the obligor's child support obligation on a case-by-case basis and shall consider the needs and the standard of living of the child[] * * * and of the parents. The court * * * **shall compute a basic combined child support obligation that is no less than the obligation that would have been computed under the basic child support schedule and applicable worksheet for a combined gross income of one hundred fifty thousand dollars**, unless the court * * * determines that it would be unjust or inappropriate and would not be in the best interest of the child, obligor, or oblige to order that amount. If the court or agency makes such a determination, it shall enter in the journal the figure, determination, and findings.

The statute was amended effective March 28, 2019; in its current form, it retains the same effect except that the $150,000 figure is replaced (both times) with "the maximum annual income listed on the basic child support schedule established pursuant to section 3119.021 of the Revised Code" (currently $336,467.04).  R.C. 3119.04 and 3119.021.

{¶ 76} The law thus steers a trial court in setting child support levels for a child of higher income parents to make a calculation of the basic worksheet amount.  That basic amount sets a preliminary floor for the support obligation, which may be adjusted downward only on a written determination, supported by findings, that such an amount would be "unjust or inappropriate and would not be in the best interest of the child, obligor, or oblige."  The preliminary floor is not a preliminary cap, however, and the court is to set the support level "on a case-by-case basis and shall consider the needs and the standard of living" of the child and the parents.  In other words, and as we have said (in the context of the pre-2019 statute and not with specific reference to the newer referenced income amount):

> Thus, in cases where the parties' combined income exceeds $ 150,000, the court is bound by three requirements. The court must: (1) set the child support amount based on the qualitative needs and standard of living of the children and parents; (2) ensure that the amount set is not less than the $150,000-equivalent, unless awarding the $150,000-equivalent would be inappropriate (i.e., would be too much), and (3) if it decides the $150,000-equivalent is inappropriate or unjust (i.e., awards less), then journalize the justification for that decision.

*Kuper v. Halbach*, 10th Dist. No. 09AP-899, 2010-Ohio-3020, ¶ 84, citing *Zeitler v. Zeitler*, 9th Dist. No. 04CA008444, 2004-Ohio-5551, ¶ 8.

**{¶ 77}** The trial court purported to understand that mandated approach. *See* Judgment Entry at 52 (citing *Kuper*). But then, after acknowledging principles including that a " 'Court must be careful * * * to consider only how the child ***would*** have lived had the parents remained together, not how the child ***could*** have lived,' " and that "[a]n award of child support cannot be a substitute for spousal support," Judgment Entry at 53 (citations omitted; emphasis in original), and after assessing the incomes of April (with some skepticism arising from such things as April's business write-offs of the nannies), *see id.* at 54-58, and Robert, *see id.* at 58-63, the trial court misconceived the $150,000-equivalent worksheet.

**{¶ 78}** "The Court is *required* to determine the amount of support that would be ordered at the $150,000 level," the trial court recited. *Id.* at 63 (emphasis added). So far, so good (assuming pre-2019 law, and reading "required" to refer to the preliminary threshold). The trial court then referred to its separately docketed (and post-2019 amendment) worksheet, "showing that the basic child support obligation of Defendant [Robert] would be $37,710.49, plus 2% processing fee, plus cash medical support of $30.77, plus 2% processing fee. The total combined monthly amount payable is $37,741.26." *Id.*at 63. But the worksheet was not the "required" $150,000-equivalent worksheet at all: It based its calculations not on parental income of $150,000 (or on the newer figure of $336,467), but instead on a "[c]ombined adjusted annual gross income" of $6,808,407.08. Trial Court's Child Support Computation Worksheet at 2, line 16. That amount was more than 45 times greater than the pre-2019 statutory figure, and more than 20 times the current statutory plug-in. Therefore, the calculated amount of the preliminary floor for child support was considerably higher than the figure would have been had it been based on the $150,000- or $336,437-equivalent levels. The very precise figure that the trial court used in ordering Robert's child support obligation came from that worksheet calculation that the trial court viewed itself as "required" to make. *See id.* at 3, line 24 ("Child Support Amount" for "Parent B" of 37,710.49).

**{¶ 79}** "Here," the trial court stated, "*the child support worksheet establishes* that [Robert] *should pay* $37,710.49 per month." Judgment Entry at 68 (emphasis added). The trial court viewed that as the (statutory) "*guideline amount*," *id.* at 70 (emphasis added),

rejecting both what it saw as April's argument for "an upward *deviation* to $100,000 per month" and Robert's request for "no child support or a nominal amount of $7,500 * * * per month," *id.* at 69 (emphasis added). Again, the trial court invoked no "guideline amount" based on the actual statutory $150,000 or $336,437 figures, but worked only from a combined income level of $6,808,407.08 ($341,225.74 attributable to April and $6,467,181.34 to Robert). Trial Court's Child Support Computation Worksheet at 2, lines 14 and 16.

{¶ 80} The trial court was not required to provide a worksheet (so long as its award did not dip below the preliminary threshold). But having done so, outside of the statutorily indicated income calculus, it erred in construing the resulting figure to be a "guideline amount" as a statutorily preliminary floor that "establishes" what Robert "should pay." Judgment Entry at 68, 70. And nothing beyond the worksheet in the rest of the trial court's child support analysis prefigures its child support result. Here, even more strongly than in *Wolf-Sabatino v. Sabatino*, 10th Dist. No. 12AP-1042, 2014-Ohio-1252, ¶ 17, the trial court's decision reflects "that the trial court simply relied on [its extra-statutory] child support worksheet calculation, rather than considering the needs and the standard of living of the child and the parties" as R.C. 3119.04 requires.

{¶ 81} The trial court was not terribly sympathetic to April in analyzing her income for child support purposes. It was "troubled by [her] tax returns for 2016, which she 'intends' to file." Judgment Entry at 54. It noted that "even though [Robert] is paying [April] $7,500 per month for the nannies, she is still expensing the payments through her law firm[,]" and those "are not the only improper deductions taken by [April] on law firm tax returns [which included payments made to her divorce lawyers]." *Id.* at 55. "Further seriously undermining [April's] credibility was her claim that she never maintained general ledgers for her law firm." *Id.* at 56. The trial court was less critical of Robert in assessing his (larger) earnings before concluding that his "income for child support purposes is $7,478,043 per year." *Id.* at 62; *compare* trial court's Child Support Computation Worksheet at 2 (using $6,467,181.34 figure for Robert's income).

{¶ 82} The trial court noted that its calculations "included the cost of one nanny since [the girl] is now enrolled in a full-time program at [a private school. Her] enrollment * * *, which cost [Robert] is paying, eliminates both the cost of one nanny and the time that [April] is required to spend with [her daughter] while she is in school." *Id.* at 63-64. And

given that April and Robert already lived separately, and that "the Dublin home is awarded to [April] and the Belmont County home is awarded to [Robert,] * * * * [the child] will reside in the same homes that she resided in during the marriage." *Id.* at 64. Similarly, because each parent came away with a vacation home in Vero Beach, Florida (with "Olde Doubloon" going to Robert and "Olde Galleon" remaining with April), the child's "ability to vacation at a home in Vero Beach will not be impacted by this divorce." *Id.* at 64.

**{¶ 83}** The trial court then noted that April had "submitted a budget that identifies $12,900 per month in expenses related to [the girl], most of which are the two nannies that [April] employs * * * ($10,300). Other than the nannies [as now being reduced by the trial court], [April] indicates that [the child's] needs cost $2,600 per month. She provided no supporting documents to back up the claimed amount of expenditures for the child." *Id.* at 64-65. The trial court also observed that, separate from the child support calculations, Robert "is covering the cost of [the girl's private school] education. [He] is also providing health insurance for [her]." *Id.* at 65.

**{¶ 84}** The trial court further noted that "other than a honeymoon to Mexico, there has been no travel outside the U.S. The private jet travel has been almost exclusively to Vero Beach * * * * The Court finds that had the Parties remained married, private jet travel for [the daughter] may have continued. The Court finds that [April and Robert] testified that they went on a short honeymoon and traveled commercially. The child is not required to travel private when the Parties have traveled commercially on their own vacation. * * * * [April] testified that she has no need to utilize [vacation] hotels since they travel to Vero Beach, where each Party will have a beach house. Since the cancellation of [chartered jet services, April] has utilized commercial flights for her trips with [the girl] to Vero Beach. * * * These trips cost about $650 per person, roundtrip. * * * Thus, for [the mother-daughter pair] to travel to Vero Beach four times per year, the cost would be $5,200 per year on commercial flights" (an average of $433 per month). *Id.* at 66.

**{¶ 85}** The trial court emphasized, consistent with our understanding of the record, that "[o]ther than the trips to Vero Beach and private schooling, [the couple's daughter] lives a fairly normal life. [Robert] testified that it was not healthy for [the girl] to have an extravagant lifestyle and that he wanted to raise her as a normal child." *Id.* at 66. The trial court also observed that Robert himself, "although wealthy, lives a very modest lifestyle. He shops twice a year for clothing and, but for his work travel, travels on commercial flights.

He has shown himself to be a responsible parent who provides for the needs of the child." *Id.* at 66-67. April had testified to hosting a "large Easter celebration where there was a costumed Easter Bunny, that [the girl] had a treasure chest with items that [April] purchased to give to her later when she was an adult, and [April] shops at some of the more elegant shops for the child's clothes. However, the receipts presented by [April] do not show the extravagant purchases for the treasure chest or clothes. [April] testified that her routine for [the child] as she gets older is to spend less on restaurants and more on groceries so [the child] can eat at home." *Id.* at 67.

{¶ 86} The trial court then returned to April's budget, noting that beyond the nannies, and as to the child, April "lists $2,000 a month for clothing, $100 for school related expenses, and $500 for extracurricular activities." *Id.* at 67; *see also* April's Ex. BB at 2. The trial court specifically stated that it "finds that [April's] 'budget' is more related to how [April] would like to live than how [the child] actually lives." Judgment Entry at 67-68 (further noting that child support cannot serve as "*de facto* spousal" support).

{¶ 87} Moreover, the trial court pointed out, the "custodial account [that had been set aside for the daughter but that April sought to claim as her own "separate property"] should be considered in calculating child support." *Id.* at 68. And the trial court then stated: "In determining whether to award a higher amount of child support [than the worksheet result] * * *, the Court is greatly influenced by [April's] removal of $1 million from [the girl's] OTMA account. [Robert] provided the funds to secure [his daughter's] future. * * * OTMA is a controlled account that [April] indicated would be used for the child's college education. Child support is to provide for the child's day-to-day needs." *Id.* at 68.

{¶ 88} None of that analysis suggests or even hints at the needs of the girl and the trio's standards of living as supporting the $37,710.49 per month that the trial court found "the child support worksheet establishes that [Robert] should pay." Judgment Entry at 68. *Compare* R.C. 3119.04 *with* Judgment Entry at 68. The record does not seem to reflect current or potential child-related expenditures remotely approaching that amount in any month, nor does the trial court suggest what the girl should do with more than $450,000 in support payments every year (although we surmise such a sum could supply a fair number of costumed Easter Bunnies, *compare* Judgment Entry at 67). April may take issue with the trial court's lifestyle summary and conclusions, *see* Cross-Appellee Brief at 29-34,

but the point at this juncture is that the trial court's stated analysis is not consistent with its worksheet-driven calculation.

{¶ 89} Interestingly, then-Judge and now-Justice Stewart has cautioned against "rote extrapolat[ion]" by applying percentages from the child support schedule to "whatever income the parents make" in cases involving incomes significantly in excess of the higher income level designated by R.C. 3119.04. *Siebert v. Tavarez*, 8th Dist. No. 88310, 2007-Ohio-2643, ¶ 34, 32. Such extrapolation "could have limited utility in guiding the court's discretion when the combined income of the parents only marginally exceeds" that threshold, she wrote, but "as the combined income of the parents rises sharply, mere extrapolation can lead to large, and possibly unrealistic, child support amounts." *Id.* at ¶ 35 (adding at ¶ 36 that "[w]e do not mean to imply that obligor parents with substantial incomes may not be required to make a very significant financial contribution to supporting their children. When making a child support determination under R.C. 3119.04(B) [as it then existed], the court must not only look to the standard of living of the child, but to that of the parents as well"). That is, the trial court must follow the directive of R.C. 3119.04 to engage in a "case-by-case" determination in such cases (an injunction that itself rules out overdependence on any preordained formula), assessing "the needs and the standard of living" of the child and her parents. April's citations to what she lists as high income "extrapolating" cases are consistent with our understanding of *Siebert*'s point: None of April's cases involved child support orders outside of the $2,300 to $4,500 monthly payment range. *See* Cross-Appellee's Brief at 8-9.

{¶ 90} In denying Robert's "request[] that the Court award * * * $54,180.72 per year" in child support, the trial court called that amount "just .007% of [Robert's] income." Judgment Entry at 69. That calculation strikes us as off by a factor of about 100 (the trial court seems to have meant .7%, if rusty math plus phone-a-friend serves). In any event, however, it does not look primarily to the needs and standard of living of the parties, including " 'the level of comfort that the child would have enjoyed beyond basic necessities had the parents remained living together.' " *Compare* Cross-Appellee's Brief at 6, quoting *N.W. v. M.W.*, 8th Dist. No. 107503, 2019-Ohio-1775, ¶ 21.

{¶ 91} As in *Wolf-Sabatino*, given "the circumstances presented in this appeal, the trial court's broad declaration that it considered the relevant factors and equitable circumstances is insufficient. We conclude that the trial court relied primarily on [its

version of] the child support calculation worksheet and abused its discretion by failing to conduct a case-by-case analysis of the needs and standard of living of the child and the parties." 2014-Ohio-1252, ¶ 17.

{¶ 92} Further, the trial court's ultimate order with regard to "Child Support" stated: "The effective date of the support order is January 1, 2020." Judgment Entry at 116. That requirement, reaching back more than one year from the May 4, 2021 Judgment Entry, seems at least in some tension with the Judgment Entry's earlier pronouncement that "[t]he Court will not make the [child support] order retroactive as [Robert] has paid all expenses for the minor child's school, was paying the majority of all expenses associated with ownership of all the marital properties, and has paid $15,000 per month for two nannies to permit [April] to work without interruption." *Id.* at 70. Again, the trial court's rationale undercuts the child support order it then makes. April's argument that any problem here was "invited by Robert" because he sought to reduce his child support obligations back to an earlier date, *see* Cross-Appellee's Brief at 23, is of limited salience in the context of arguably conflicting trial court statements in the context of significantly increasing his support payments. And her argument that the order is "***not*** retroactive" with respect to certain dates including "the effective date of the last temporary support order," *see id*. at 25 (emphasis in original), is equally unavailing: Despite its lead-up, the order is retroactive to all of the time encompassed by that last temporary order.

{¶ 93} Nothing in our decision should be construed to reach any conclusion as to what the appropriate level of Robert's child support obligation or its effective date should be. Because we find that the trial court abused its discretion in determining the obligation on the basis of what it seems to have viewed as a statutory formula without accounting for its case-specific analysis, we sustain Cross-Appellant Robert's first assignment of error and return the child support issue, in full, to the trial court for such further proceedings and determinations as are appropriate consistent with this decision.

{¶ 94} Robert's second assignment of error urges that "[t]he trial court's award to [April] of one-half of the appraised value of the Olde Doubloon property, rather than one-half of the stipulated marital value, was contrary to the manifest weight of the evidence." Cross-Appellant's Brief at v (capitalizations adjusted).

{¶ 95} We agree. As Robert argues, the parties agreed and the trial court found that the Olde Doubloon property in Vero Beach had a value of $2,600,000, of which $873,103

was Robert's separate property and $1,726,897 was marital property. *See* Judgment Entry at 19. The trial court awarded the property to Robert, and made no findings that it would be inequitable to divide that marital property evenly while also leaving Robert with the value of his separate interest, but, perhaps distracted by a lengthy analysis of what it viewed as "red herring" arguments that Robert had contracted to surrender his ownership interests in the house, *see* Judgment Entry at 43-51, found the property to be "marital in nature valued at $2,600,000" and ordered Robert to pay April "$1,300,000 for her marital interest in the subject property," *id.* at 52. The evidence and the court's findings show that that sum did not reflect April's marital interest.

{¶ 96} Contrary to what we understand to be April's position, this error does not require "de novo" division of this or all the Moores' property. *Compare* Cross-Appellee's Brief at 35 (conceding a problem here). Recognizing the trial court's award of Olde Doubloon in full to Robert, we sustain his second assignment of error and return the matter to the trial court to revise its order regarding the amount of Robert's consequent payment. We are aware that resolution of this issue may to some extent balance implications of the revaluation of the New Albany Tensweep Drive property as discussed above under April's seventh assignment of error, but the issues are discrete.

{¶ 97} In his third and final cross-appeal assignment of error, Robert posits that "[t]he trial court erred and abused its discretion in awarding $775,000 in attorney fees to plaintiff-appellant April Bott Moore." Cross-Appellant's Brief at v (capitalizations adjusted).

{¶ 98} We note first that we agree with the premise of the assignment that the trial court's final award of $775,000 in attorney fees to April included the $700,000 that it said Robert already had "advanced * * * toward [April's] attorney fees." Judgment Entry at 109. The trial court was mindful that it had ordered Robert earlier to pay that "$700,000 in pre-decree attorney fees to prevent prejudice to [April] in defending herself during trial." *Id.* at 105. The trial court did find that "[m]uch of the litigation in this matter was the direct result of [April's] pre- and post-litigation conduct, and not on the defense of her marital rights. For example, it was [April] who changed the license plates * * * to avoid detection that [her gentleman friend] had used that car while he was in Vero Beach. It was [April] who moved the money from [their daughter's] OTMA account into her own money market account. It was [April] who sent tens of thousands of dollars to relatives after she discovered [his]

infidelity." *Id.* at 108.  But given that April "had two attorneys in court throughout the [lengthy] trial," the trial court concluded that it "cannot find that it is unreasonable to award [April] additional attorney fees." *Id.* at 109.  April "expended far more than $700,000 for the prosecution of this case," the trial court determined, and "[i]t would not be equitable to have the [we read, 'additional'] attorney fees taken from [April's] marital portion due to the disparity of income." *Id.* at 110.

{¶ 99}    So the trial court "[t]herefore" added another $75,000 to the pre-paid total, declaring that April " is awarded $775,000 in attorney fees * * * ." *Id.* at 110.  April purports now to believe that whether the decree's $775,000 fee award is "in addition to" fee payments already made is an open question under the language of the decree.  *See* Cross-Appellee's Brief at 55-56.  It is not.  The decree envisions a $75,000 balance owed by Robert to April, and does not reopen allocations to trace the $700,000 already paid.  *Compare* Cross-Appellee's Brief at 56-57.  April (who does not seem shy about assigning error) did not raise these matters as assignments of error to us, and we will not consider them as such here.  We do consider Robert's assignment, and are not persuaded by it.

{¶ 100} R.C. 3105.73(A) provides:

> In an action for divorce, * * * a court may award all or part of reasonable attorney's fees and litigation expenses to either party if the court finds the award equitable. In determining whether an award is equitable, the court may consider the parties' marital assets and income, any award of temporary spousal support, the conduct of the parties, and any other relevant factors the court deems appropriate.

The statute does not trigger directly a prevailing party analysis, but instead requires an award to be "equitable" in light of the permissive factors.  We review a trial court's divorce action fee award for abuse of discretion, *see, e.g., Rand v. Rand*, 18 Ohio St.3d 356, 359 (1985), and we find the trial court's award here to be a live issue appropriate at this stage for our review.

{¶ 101}   The trial court looked to the factors that the statute specifies, and concluded that April's expenditures for prosecution of her case far exceeded $700,000 even before trial was concluded; it reasonably added $75,000 in fees (covering the balance of trial and such things as "the drafting of complex proposed decrees and findings," Judgment Entry at 110), to that conservative number.  The trial court accepted redacted billing statements that

did not disclose the nature of the work performed for the specified time charges, but even a cursory review of the record of this case (and this appeal) confirms that it has been, we dare say, heavily lawyered on both sides. *Compare id.* at 109 (noting, after recounting Robert's discovery efforts and active pursuit of his counterclaim, that the "case was extremely litigious with both sides filing numerous motions, motions to strike, [and] objections to Magistrate Decisions, and [that] each Party responded to the other in writing").

{¶ 102} The domestic relations trial judge had a ringside seat to the action, considered it for years, and was in a position to assess the legal work done on April's behalf. The trial court had evidence of the amount of the fees and time billed, knew the work done, and made findings in support of its award. *Compare, e.g., Citibank v. Wood*, 2d Dist. No 2007 CA 48, 2008-Ohio-2877, ¶ 49 (no evidentiary material). Robert cites us to the unreported decision in *Day v. Day*, 10th Dist. No. 90AP-745, 1991 Ohio App. Lexis 2325 (May 14, 1991), *12-13, but the trial court's determination here was not inconsistent with that decision, which applied the Supreme Court's observation in *Bittner v. Tri-County Toyota, Inc.*, 58 Ohio St.3d 143 (1991), that: "When awarding reasonable attorney fees pursuant to [a different statute], the trial court should first calculate the number of hours reasonably expended on the case times an hourly fee, and then may modify that calculation by application of the factors listed in [the Ohio Code of Professional Responsibility]." We understand that "[g]iven the trial court's greater familiarity with the progress of the matter before it and its inherently superior position to observe the relative conduct of the parties and counsel, the trial court was in a good position to assess the effectiveness of counsel and the reasonableness of fees." *Long v. Long*, 10th Dist. No. 11AP-510, 2012-Ohio-6254, ¶ 20.

{¶ 103} The trial court may have given more weight than Robert likes to the parties "disparity of income," *see* Judgment Entry at 110, but consideration of "marital assets and income" is a factor that statute specifically permits the trial court to consider. R.C. 3105.73(A). And the trial court in the context of its fee award also examined the "conduct of the parties," *see id.*, although it may have weighted certain actions differently from the way Robert would. (Robert cites *Farley v. Farley*, 97 Ohio App.3d 351 (8th Dist.1994) for his weighting preferences, *see* Cross-Appellant's Reply Brief at 17, but that was not a case decided under R.C. 3105.73 (as adopted in 2005), as the Eighth District later had cause to observe in a different context, *see Allan v. Allan*, 8th Dist. No. 107142, 2019-Ohio-2111,

¶ 96, and presented a rather different factual scenario. And with April's billed fees having exceeded one million dollars overall, *see* Robert's own Proposed Divorce Decree in Supplemented Record at 52 ("[April] presented various exhibits showing that her total attorney fees and expenses in this matter totaled $1,050,512"), it does not appear that the trial court contradicted itself and defrayed April's fees in connection with the motion to reconsider the marriage's de facto termination date.

**{¶ 104}** Given the entire context of this case, we do not find that the trial court's fee award was an abuse of discretion. We overrule Robert's third assignment of error, while noting that nothing in this decision will preclude the trial court from ruling on further fee issues that may arise from the positions of either party on the trial court's consideration of the select matters (including the appropriate level of child support) that it will take up on remand.

**{¶ 105}** We have rejected April's Suggestion that we may lack jurisdiction over her appeal and over Robert's cross-appeal. We have overruled April's first assignment of error, and therefore we deny as moot Robert's motion that we dismiss that assignment. We also have overruled April's second, third, fourth, sixth, eighth, tenth, eleventh, twelfth, thirteenth, fifteenth, sixteenth, seventeenth, and eighteenth assignments of error. We have sustained April's fifth, seventh, ninth, and fourteenth assignments of error. We further have sustained Robert's first and second assignments of error on his cross-appeal, and have overruled his third assignment of error. For the reasons outlined above, we affirm in part and reverse in part the judgment of the Franklin County Court of Common Pleas, Division of Domestic Relations, and we remand this case to that court to address in a manner consistent with this decision the errors that we have identified.

*Judgment affirmed in part and*
*reversed in part; cause remanded.*

KLATT and BEATTY BLUNT, JJ., concur.

NELSON, J., retired, of the Tenth Appellate District, assigned
to active duty under the authority of the Ohio Constitution,
Article IV, Section 6(C).

_____